STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. PETER DYAL, DEFENDANT-RESPONDENT.

Argued April 3, 1984—Decided July 31, 1984.

*Allan J. Nodes,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Allan J. Nodes, Richard T. Carley,* and *Victoria Curtis Bramson,* Deputy Attorneys General, of counsel and on the brief).

*Neil H. Shuster* argued the cause for respondent (*Carchman, Annich, Sochor, & Shuster,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The main issue on this appeal is whether the patient-physician privilege created by *N.J.S.A.* 2A:84A–22.2 precludes admission of results of a blood test into evidence in the prosecution of a death-by-auto case. A second issue is whether the prosecutor's reference during summation to a .10% blood alcohol reading as the "legal threshold" constitutes reversible error.

In this case, a hospital employee took a blood sample for medical diagnosis, not for police investigative purposes. The employee told the defendant, who had operated a motor vehicle involved in a tragic accident, that the purpose of the test was to determine his blood type in the event a transfusion was necessary. No police officer was present and the defendant, who had not been arrested and was not in custody, consented to the test. As the police subsequently learned, the results indicated that the defendant was under the influence of alcohol while operating the motor vehicle.

The trial court denied defendant's motion to suppress the results, which were admitted into evidence at trial, and the jury convicted the defendant of causing death-by-auto. In an unreported decision, the Appellate Division ruled that the blood test fell within the patient-physician privilege and that it should not have been admitted into evidence. The court also found that the prosecutor's reference to the legal threshold under the drunken driving statute was reversible error. Consequently, the Appellate Division reversed the conviction and remanded the matter for trial.

■ We granted certification, 95 *N.J.* 182 (1983). We now hold that to obtain the results of a blood test protected by the patient-physician privilege, the police should apply to a municipal court judge for a subpoena *duces tecum*. Upon a showing by the police that they have a reasonable basis to believe the defendant was operating a motor vehicle while under the influence, the judge may issue a subpoena. In establishing a reasonable basis, the police may rely on objective facts known by them at the time of the event or within a reasonable time thereafter. Consequently, we modify the judgment of the Appellate Division to the extent it ruled inadmissible the results of the blood test and remand the matter for trial. On remand, the police may renew their application to introduce the results of the blood test. We also hold that the prosecutor erred in referring on summation to the ".010 legal threshold," but that the error was harmless.

I

At approximately 7:15 p.m. on April 6, 1979, defendant, Peter Dyal, accompanied by Jan Kane, his close friend and only passenger, was driving his 1979 Porsche on Ridge Road, in South Brunswick. While negotiating a sharp curve in the road, Dyal lost control of his car, which flipped over and landed in an adjacent field.

Patrolman Ronald Horinko of the South Brunswick Township Police Department arrived on the scene at about 7:27 p.m. He observed Miss Kane, who was unconscious and lying face down in the field, as well as defendant, who was in an ambulance. Officer Horinko climbed into the ambulance and, from a distance of two feet, ascertained from defendant that he was the operator of the vehicle. The officer did not detect any odor of liquor or anything else that might indicate defendant was under the influence of alcohol. He left as Miss Kane was carried into the ambulance, which then took her and Dyal to Princeton Medical Center (PMC).

At the suppression hearing, the trial court found that "[b]ecause Dyal and Kane needed immediate hospital care, Horinko was unable to question Dyal as to the cause of the accident. The urgency also deprived Officer Horinko of an opportunity to observe Dyal for any meaningful period for evidence of drinking."

Officer Horinko returned to Ridge Road, placed flares along the curve, took some measurements, summoned a tow truck, and interviewed the driver of the car behind defendant's vehicle. Thereafter he returned to police headquarters and twice called PMC that evening to inquire about the condition of Miss Kane and defendant. Although he learned that they were still receiving treatment, Officer Horinko did not request that a blood test of defendant be taken for investigative purposes.

After being taken from the scene to PMC, defendant was treated for a cut over his right eye. In response to defendant's inquiry, a hospital employee explained to defendant that a blood test should be made in the event he needed a transfusion. Based on that explanation, defendant allowed a blood sample to be taken. Tests performed on the sample revealed, among other things, a serum alcohol reading of .161. After about two hours, defendant was released from the hospital early in the morning of April 7.

On April 8, Jan Kane died from the injuries sustained in the accident. At that time Officer Horinko had no suspicion that alcohol had played any part in the tragedy. Two days later, however, Penny DeMetro and Sandra Lee, two employees at Princeton Meadows Country Club, where Miss Kane had been the manager, voluntarily went to South Brunswick Police Headquarters to give statements about events preceding the accident. Both witnesses also testified at trial, where the following facts emerged.

Mrs. DeMetro was tending bar when defendant arrived at the club, where he was a member. She placed his time of arrival between 2:00 p.m. and 4:00 p.m., and he placed it closer to 5:00 p.m. Mrs. DeMetro did not serve defendant any alcoholic beverages, and she was talking to him when Miss Lee arrived to tend bar at 5:00 p.m.

According to Miss Lee, she served defendant three to four drinks, each consisting of approximately one to one-and-one-quarter ounces of "Seagrams VO" and water. Her testimony was roughly consistent with that of the defendant, who stated that he had had three drinks during a period of two to two-and-one-half hours.

After interviewing Mrs. DeMetro and Miss Lee, Officer Horinko obtained a subpoena from the South Brunswick Municipal Court Clerk ordering PMC to release the results of defendant's blood alcohol test. At that time no proceeding was pending in connection with the accident, and nothing indicates that the officer made any showing of facts to support the issuance of the subpoena. Apparently, he simply asked the court clerk for the subpoena, and she complied with his request.

The subpoena issued on April 11, and Horinko obtained the records on the same day. He forwarded the records to the New Jersey State Police Laboratory, which informed him two weeks later, on April 25, that the .161 serum reading converted to a 0.12% blood alcohol content. On the following day, April 26, Officer Horinko issued a summons charging defendant with

operating a motor vehicle while under the influence of alcohol contrary to *N.J.S.A.* 39:4–50. Thereafter, in November 1979, defendant was indicted on charges of death-by-auto in violation of *N.J.S.A.* 2A:113–9.

The trial court denied defendant's motion to suppress the results of the blood test, and defendant unsuccessfully sought leave to appeal that ruling. At the trial, the results were introduced into evidence and the jury convicted defendant of causing death-by-auto.

The Appellate Division reversed defendant's conviction, finding that the blood test results were within the patient-physician privilege of *N.J.S.A.* 2A:84A–22.2. In rejecting the State's argument that the statutory privilege should yield to the full disclosure of truth at trial, the Appellate Division characterized the State's position as advocating "a per se rule that would virtually eliminate the applicability of the physician-patient privilege to a criminal prosecution for death by auto."

## II

No patient-physician privilege existed at common law in New Jersey, *Hague v. Williams,* 37 *N.J.* 328, 334–35 (1962), throughout the United States, or in England. *See* 8 *J. Wigmore, Evidence* § 2380, at 819 (McNaughton Rev.1961) (*Wigmore*). Starting in New York in 1828, however, state legislatures began enacting statutes providing for the privilege, and more than two-thirds of the states now recognize it. 8 *Wigmore, supra,* § 2380, at 819–20 (1961 & Supp.1984).

Originally, the commissioners on uniform state laws rejected the privilege, but then reversed their position and included it in the 1955 version of the Uniform Rules of Evidence. *See Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey R.* 27, drafter's comment, at 71 (1955). In this state, the original Supreme Court Committee on the Revision of the Law of Evidence specifically recommended that the privilege be excluded from

the Rules of Evidence, *id.* at 71–72, and no such rule has ever been adopted by this Court. *See State v. Soney,* 177 *N.J.Super.* 47, 57 (App.Div.1980), certif. den., 87 *N.J.* 313 (1981). In 1968, however, the Legislature adopted *N.J.S.A.* 2A:84A–22.2, which provides:

Except as otherwise provided in this act [*see N.J.S.A.* 2A:84A–22.3 to –22.7], a person, whether or not a party, has a privilege in a civil action or in a prosecution for a crime or violation of the disorderly persons law or for an act of juvenile delinquency to refuse to disclose, and to prevent a witness from disclosing, a communication, if he claims the privilege and the judge finds that (a) the communication was a confidential communication between patient and physician, and (b) the patient or the physician reasonably believed the communication to be necessary or helpful to enable the physician to make a diagnosis of the condition of the patient or to prescribe or render treatment therefor, and (c) the witness (i) is the holder of the privilege or (ii) at the time of the communication was the physician or a person to whom disclosure was made because reasonably necessary for the transmission of the communication or for the accomplishment of the purpose for which it was transmitted or (iii) is any other person who obtained knowledge or possession of the communication as the result of an intentional breach of the physician's duty of nondisclosure by the physician or his agent or servant and (d) the claimant is the holder of the privilege or a person authorized to claim the privilege for him.

Just last year, the Senate approved a bill, S. 2021, 200th Legis., providing that "anyone who operates a motor vehicle * * * shall be deemed to have given his consent" to blood and urine tests for the purpose of determining his blood alcohol content. The bill eliminated the privilege with respect to the use of those samples in drunken driving prosecutions under *N.J.S.A.* 39:4–50. Although the Senate approved S. 2021, the Assembly did not vote upon it, and the bill expired at the end of the legislative term.

In the current legislative term, a successor bill, S. 1056, also eliminates the privilege with respect to the use of blood and urine samples in drunken driving prosecutions. The bill further permits the use of such samples in various proceedings, including prosecutions under *N.J.S.A.* 2C:11–5, the current statute prohibiting death-by-auto. The Senate has approved S. 1056, and on March 15, 1984, the Assembly gave the bill a second reading. At the present time, nonetheless, the Legislature has

continued to permit defendants to have recourse to the privilege in death-by-auto prosecutions.

In this matter, the State acknowledges that the test results obtained from blood drawn from the defendant while at PMC satisfy the literal requirements of the statute. The State contends, however, that ·the privilege must yield to the public interest for the disclosure of relevant facts in the prosecution of drunken driving cases. No one can doubt that the clear public policy of this State is to rid the highways of drunken drivers. *See, e.g., Kelly v. Gwinnell,* 96 *N.J.* 538, 544–545 (1984); *State v. Dively,* 92 *N.J.* 573, 588–89 (1983); *In re Kallen,* 92 *N.J.* 14, 28–29 & n. 7 (1983); 1984 N.J.Sess.Law Serv. ch. 4 (West) (imposing $100 surcharge on those convicted of drunken driving); 1984 N.J.Sess.Law Serv. ch. 1 (West) (imposing a three-year $1,000 per year license fee for convicted drunken drivers); 1983 N.J.Sess.Law Serv. ch. 307 (West) (prohibiting consumption of alcohol by a motor vehicle operator or passenger).

■ This case requires us to balance that policy with the statutory privilege protecting communications between patient and physician. The purpose of the privilege is to permit patients to disclose facts necessary for diagnosis and treatment, *McCormick, Handbook of the Law of Evidence* § 98, at 212–13 (2d ed. 1972) (*McCormick* ), a purpose that the privilege achieves by protecting the patient from the adverse consequences that would follow from disclosure.

■ The inevitable effect of allowing the privilege, nonetheless, is the withholding of evidence, often of the most reliable and probative kind, from the trier of fact. To the extent that the privilege is honored, it may therefore undermine the search for truth in the administration of justice. *McCormick, supra,* § 105, at 226; 8 *Wigmore, supra,* § 2380a, at 830. Because the privilege precludes the admission of relevant evidence, it is restrictively construed. *State v. Soney, supra,* 177 *N.J.Super.* at 58; *State in the interest of M.P.C.,* 165 *N.J.Super.* 131, 136

(App.Div.1979). Indeed, distinguished scholars have asserted that the privilege cannot be justified. *See, e.g.,* Chaffee, "Is Justice Served or Obstructed by Closing the Doctor's Mouth on the Witness Stand?," 52 *Yale L.J.* 607 (1943); 8 *Wigmore, supra,* § 2380a, at 832. Opponents of the privilege contend that when a patient seeks medical treatment, his concern will be for cure, and fear of subsequent disclosure will not prevent the communication of relevant information to a physician. *See McCormick, supra,* § 105, at 225; 8 *Wigmore, supra,* § 2380a, at 829.

Conceivably, however, the driver of a car involved in a fatal accident might refuse to provide a blood sample, even when the refusal would preclude the possibility of a blood transfusion. The driver's fear of criminal prosecution in a death-by-auto case, for example, might outweigh his concern for his own health. Here, the defendant, who did not need a transfusion, might have refused to provide a blood sample if he had known that a blood alcohol test would be conducted and the results made available to the police. That consideration becomes more compelling when, as here, the investigating police did not believe that defendant was intoxicated at the time the sample was taken. What is needed, therefore, is a sensible accommodation of the privilege and the interests of justice. *See State v. Briley,* 53 *N.J.* 498, 506 (1969) (interspousal privilege can yield when no violence is done to its underlying policy and greater justice is served by allowing wife to testify).

■■ A drunken driver arrested by police with probable cause to believe he is intoxicated has no federal constitutional right to prevent the involuntary taking of a blood sample. Of course, the sample should be taken in a medically acceptable manner at a hospital or other suitable health care facility. *Schmerber v. California,* 384 *U.S.* 757, 771–72, 86 *S.Ct.* 1826, 1836, 16 *L.Ed.*2d 908, 920 (1966). Similarly, the statutory patient-physician privilege does not prevent a blood test of one who is arrested on probable cause to believe he is intoxicated and who is taken by police in custody to a hospital for diagno-

sis. *State in the interest of M.P.C.*, *supra*, 165 *N.J.Super.* at 138.

Furthermore, when police accompany a motor vehicle operator to a hospital under such circumstances and a blood test is taken for diagnosis, no useful purpose would be served by requiring the police to obtain a second test for investigative purposes. Accordingly, we disapprove *State v. Amaniera*, 132 *N.J.Super.* 597 (Middlesex County Ct.1974), which applied the privilege to preclude disclosure of blood tests, although police were at the hospital at the time the blood sample was taken and were prevented from obtaining another sample only because defendant was receiving medical attention. *Id.* at 603.

As a practical matter, the encounter between a patrolman and a drunken driver often arises in the context of an emergency. The officer may be alone, an accident may have occurred, people may be injured, and the public safety may be imperiled. Although search warrants ordinarily might be required where no emergency exists, *Schmerber v. California*, *supra*, 384 *U.S.* at 770, 86 *S.Ct.* at 1835, 16 *L.Ed.*2d at 919, in emergencies police may search for and seize evidence without first obtaining a search warrant. *Schmerber v. California*, *supra*, 384 *U.S.* at 770–71, 86 *S.Ct.* at 1835–36, 16 *L.Ed.*2d at 919–20; *see also United States v. Ross*, 456 *U.S.* 798, 824, 102 *S.Ct.* 2157, 2172, 72 *L.Ed.*2d 572, 593 (1982) (scope of warrantless search under automobile exception to the fourth amendment may be as broad as search pursuant to warrant); *Chimel v. California*, 395 *U.S.* 752, 762–63, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685, 694 (1969) (a warrantless search incident to a lawful arrest extends to the area within arrestee's immediate control). The authorization to conduct a warrantless search on probable cause is particularly appropriate when a policeman arrests an apparently intoxicated automobile operator.

One crucial consideration is that the body eliminates alcohol at a rapid rate. *Schmerber v. California*, *supra*, 384 *U.S.* at 770–71, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 919–20. The evidence is evanescent and may disappear in a few hours. Investigating

police, while coping with an emergency, should not be obliged to obtain a search warrant before seeking an involuntary blood test of a suspected drunken driver.

In some cases, the concerns of the moment may prevent investigating police from gathering facts needed to establish probable cause. Consequently, law enforcement officers may be unable to accompany a motor vehicle operator to a hospital for the purpose of obtaining a blood test. As here, the public interest may require investigating officers to perform other duties at the scene of an accident. Within a reasonable time after the event, however, witnesses may come forward or other facts may emerge that establish a reasonable basis to believe that the operator was intoxicated.

In the present case, despite their ongoing investigation, the South Brunswick police did not learn for four days that alcohol may have contributed to the accident and death of defendant's passenger. By that date, it was impossible to obtain an accurate second blood alcohol test.

In a matter so deeply imbued with the public interest as a case involving a suspected drunken driver, the investigating police should not be deprived of blood test results merely because they were not present when the blood sample was taken. Those results are not only relevant, but may be highly persuasive in determining whether the driver was drunk.

Nor should a patient's interest in the confidentiality of hospital records preclude all access to records of blood alcohol test results. That interest can be protected adequately by requiring investigating police to establish a reasonable basis to believe that the operator was intoxicated, a showing that may be established by objective facts known at the time of the event or discovered within a reasonable time thereafter.

Such a showing should be presented in an application for a subpoena before a judicial officer, generally a municipal court judge having jurisdiction in the municipality where the records are located. *Cf. R.* 3:5-1 ("[a] search warrant may be issued by a judge of a court having jurisdiction in the municipality where

the property sought is located."). If no case is pending against the operator, the subpoena may be captioned "In the Matter" under investigation. Here, for example, the subpoena could have been captioned "In the Matter of the Investigation of a Motor Vehicle Accident on April 6, 1979."

Records obtained pursuant to the subpoena will be subject to a motion to suppress made within thirty days of the initial plea to any resulting charge unless the court for good cause shown enlarges the time. *Cf. R.* 3:5-7(a) (motion to suppress evidence obtained by allegedly unlawful search and seizure should be filed within thirty days of initial plea). Given the protection accorded blood test results by the statutory privilege, we believe that a subpoena for records of those tests should be treated as the functional equivalent of a search warrant. *Cf. State v. Hall,* 93 *N.J.* 552, 557–59, *cert. den.* —— U.S. ——, 104 *S.Ct.* 526, 78 *L.Ed.*2d 709 (1983) (approving investigative detention upon showing of "a reasonable and well-grounded basis to believe" that subject may have committed a crime). Although the prescribed procedure follows that applicable for the issuance of such a warrant, we conclude that a subpoena, which is commonly used to obtain hospital records, is the more appropriate vehicle.

In the present case, the trial court found that the police acted diligently in conducting the investigation, but the court did not determine whether they had a reasonable basis to believe that the defendant was intoxicated at the time of the event. Given the serious nature of the charge, we believe the appropriate decision is to remand the matter to the trial court.

■ As to the second issue raised on this appeal, the State acknowledges that the prosecutor erred in referring on summation to the .10% "legal threshold" applicable to drunken driving cases, but contends that the error was harmless. We agree. Before summations, the trial court ruled that it would not charge the statutory presumption for drunken driving in this death-by-auto case. Although the prosecutor should not have referred to that presumption, our review of the entire summa-

tion leads us to conclude that the error was harmless. *R.* 2:10–2. The reference did not deprive defendant of a fair trial or of a fair decision on the merits. *State v. Macon,* 57 *N.J.* 325, 328 (1971).

On remand, the trial court should determine the admissibility of the test results at a hearing, at which one issue will be whether sufficient objective facts support the conclusion that the police had a reasonable basis to believe that defendant was intoxicated at the time of the accident. The relevant facts will include those known at that time or within a reasonable time thereafter. We leave to the discretion of the trial court whether the record made at the time of trial is sufficient or whether additional evidence is required to resolve the issue. If the court makes a finding that a reasonable basis existed and otherwise finds that the records are admissible, the test results may be introduced in evidence at trial. The fact that the police did not obtain court approval before the clerk issued the subpoena shall not affect admissibility of the test results in this case.

The judgment of the Appellate Division is affirmed as modified.

*For modification and affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POL-LOCK, O'HERN and GARIBALDI—7.

*Opposed* —None.