277 N.J. Super. 51 (1994)
648 A.2d 1153
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PAUL WARMBRUN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 11, 1994.
Decided November 1, 1994.
*54 Before Judges VILLANUEVA, WEFING and BILDER.
Susan L. Reisner, Public Defender, attorney for appellant (Joel C. Seltzer, Designated Counsel, of counsel and on the brief).
Defendant filed a supplemental brief pro se.
Deborah T. Poritz, Attorney General of New Jersey, attorney for respondent (Craig V. Zwillman, Deputy Attorney General, of counsel and on the letter brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Defendant, Paul Warmbrun, appeals from a conviction of reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). We affirm.
On February 17, 1989, North Brunswick Police Officer Joseph Battaglia was dispatched to Route 130 South at about 9:17 p.m. He observed the body of Dana Richmond on the shoulder of the road and indicated the victim was dead at that time. Prompt investigation disclosed that he had been struck by a station wagon driven by defendant and that defendant was apparently under the *55 influence of alcohol at the time. Battaglia and his backup, Kenneth Hoffman, investigated the scene.
Claire Smith, Michael Wilder and Peter Tornabene testified as to defendant's erratic driving and the broken windshield on the driver's side of his vehicle. Wilder and Tornabene determined that defendant was intoxicated, and observed glass in his hair and alcohol on his breath.
Patrolman Jim Bramble of the East Windsor Police Department received a call at about 9:40 p.m. concerning a white station wagon. Bramble proceeded to Windsor Mills on Old Trenton Road and observed the defendant leaning against the station wagon and that defendant had difficulty standing and was covered with glass. Defendant told Bramble that he had driven his car from New Brunswick. Defendant was antagonistic and uncooperative, and his speech was slurred.
After detecting a strong odor of alcohol on defendant's breath, Bramble arrested defendant, read him his Miranda[1] rights and took him to the East Windsor Police Station. Defendant was unable to walk unassisted. While traveling to the station, defendant without being questioned, said that someone shot his windshield with a gun and that he was going to sue Officer Bramble. Defendant was again read his Miranda rights at the station and he indicated that he understood those rights but refused to sign the Miranda form. Defendant was also read his DWI rights.
Defendant told the police that he had consumed a couple of glasses of chablis but no drinks after about 4:00 p.m. Bramble requested that defendant perform several balance tests and an alphabet test, both of which defendant failed. At approximately 10:42 p.m., Bramble began to ask standard breathalyzer questions of defendant. Defendant had agreed to take a breathalyzer but when he was given the test he repeatedly refused to exhale into the machine which prevented a reading from being taken.
*56 Meanwhile, Battaglia received a communication regarding the vehicle and a possible suspect, defendant, found at Country Mill Road in East Windsor. The vehicle was impounded after Battaglia arrived at the scene. He observed that defendant's face was flushed, his eyes bloodshot, his movements slow, and he had a strong odor of alcohol and looked "disheveled."
After defendant refused to take the breathalyzer test, Bramble and other officers proceeded with the defendant to Princeton Medical Center where the officers observed a blood sample taken. Defendant was then brought to the North Brunswick Police Department where Officer Ruvolo witnessed Officer Curry read defendant his Miranda rights. This time defendant signed the Miranda card at approximately 12:55 a.m. Ruvolo stated that defendant looked coherent but noted that earlier defendant had slurred speech at the hospital.
Middlesex County Prosecutor Investigator Ken Mazza, after reading defendant his Miranda rights, questioned defendant and tape recorded defendant's statement. Defendant appeared intoxicated with slurred speech, red eyes, a flushed face and the odor of alcohol. According to Mazza's testimony at the suppression hearing, when questioned about other people at work who were at the party he attended, defendant indicated that he would not answer certain questions without an attorney. Mazza stopped questioning when defendant called his wife and said that he wanted an attorney.
At trial, Mazza testified as an expert in accident reconstruction and opined that the victim was struck and killed on the shoulder of the road based on where the tire print from defendant's car was located.
Steven Andrews, a forensic scientist for the New Jersey State Police, testified that the blood samples taken from defendant revealed a blood alcohol content of between .238 and .240 percent or between .23 and .25 percent within a reasonable degree of scientific certainty.
*57 Charles G. Tindall, Chief Forensic Chemist for the State Police also testified and stated that wine or ethyl alcohol is a depressant and at a .238 blood alcohol level an individual is severely impaired. Tindall testified that a 150-pound man would have to drink ten four ounce glasses of table wine to have a .238 blood alcohol level. Tindall concluded that defendant was severely impaired on the night of the accident.
William Ebbinghouser testified for the defense that he had been with defendant on the date of the accident and that both men had gone to a birthday celebration at a nearby restaurant after work. He testified that between 1:30 p.m. and 5:00 p.m. he saw defendant have three or four drinks. He believed that defendant looked coherent.
John Zamparo, an engineering expert, also testified for the defense and stated that the reports he viewed did not contain a "point of impact" necessary for describing the exact spot where the accident took place. Zamparo also opined that the tire print did not match defendant's car. Zamparo therefore concluded that Mazza was incorrect in his theory that because there was no physical evidence to indicate the accident happened in the road it must have occurred on the shoulder of the road. Zamparo stated there was a high probability that the collision occurred in the "travel portion of the roadway."
Defendant was indicted by a Middlesex County Grand Jury for aggravated manslaughter, first degree, N.J.S.A. 2C:11-4a.
The judge denied a motion to dismiss the indictment based upon defendant's argument that the State had failed to provide the grand jury with proper instructions as the elements of aggravated manslaughter.
At a pretrial hearing the trial judge held that defendant's statements to police at the scene of the crime prior to receiving Miranda warnings were admissible as non-custodial investigative questioning, and that statements made after the Miranda warnings were given were admissible because they were made knowingly *58 and voluntarily. Other statements made to the prosecutor's investigator were ruled inadmissible because the investigator did not cease questioning when defendant requested an attorney.
After the State presented its case to the jury, the judge denied defendant's motion for judgment of acquittal, and the jury convicted defendant of reckless manslaughter, N.J.S.A. 2C:11-4b(1). The jury found defendant not guilty of aggravated manslaughter.
Defendant was sentenced to a prison term of ten years with three years parole ineligibility. The court imposed a V.C.C.B penalty of $30, a fine of $1,000 and a loss of driving privileges for two years, upon release from prison. Fines in the amount of $750 plus a $100 surcharge and an aggregate eighteen months[2] driver's license suspension consecutive to the two years were also imposed for driving while under the influence, leaving the scene of an accident and refusal to take a breathalyzer test.[3]
On appeal defendant argues:
POINT I COURT'S FAILURE TO DISMISS INDICTMENT WAS PREJUDICIAL ERROR BY REASON OF PROSECUTOR'S FAILURE TO PROVIDE THE GRAND JURY WITH [a] PROPER ELEMENT OF AGGRAVATED MANSLAUGHTER. N.J.S.A. 2C:11-4(a).
POINT II THE COURT ERRED IN NOT DISMISSING THE INDICTMENT BY REASON OF THE STATE'S FAILURE TO CHARGE ALTERNATIVE OFFENSES. U.S. CONST. AMEND. V; N.J. CONSTITUTION ART. I § 8 (1947).

POINT III DEFENDANT'S REFUSAL TO SIGN MIRANDA RIGHTS WAIVER CARD REQUIRES SUPPRESSION OF STATEMENT MADE TO PATROLMAN BRAMBLE.

*59 POINT IV STATE'S MANNER OF OBTAINING BLOOD SAMPLE FROM DEFENDANT VIOLATED HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
POINT V THE STATE'S FAILURE TO SUSTAIN ITS BURDEN OF PROOF REQUIRED AN ENTRY OF JUDGMENT OF ACQUITTAL IN DEFENDANT, PAUL WARMBRUN'S FAVOR; AND IN THE ALTERNATIVE, THE JUDGMENT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

I.
Defendant contends that the indictment should have been dismissed because the prosecutor failed to define for the grand jury a specific element of the crime of aggravated manslaughter: "death under circumstances manifesting extreme indifference to human life." Defendant claims this failure confused the grand jurors as to whether they were voting on aggravated manslaughter or manslaughter, and this confusion is fatal to the indictment because aggravated manslaughter is a first degree crime with a higher penalty than the second degree crime of manslaughter.
The difference between manslaughter and aggravated manslaughter is the element of aggravated manslaughter requiring that the actor recklessly committed the homicide "under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4. Defendant contends that the omission of a definition for that distinguishing phrase was misleading and fatally unclear and required dismissal of the indictment.
"Whether an indictment should be dismissed or quashed lies within the discretion of the trial court. Such discretion should not be exercised except on `the clearest and plainest ground' and an indictment should stand `unless it is palpably defective.'" State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 18-19, 472 A.2d 1050 (1984) (quoting State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952) (citations omitted); accord State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979); State v. Ball, 268 N.J. Super. 72, 119, 632 A.2d 1222 (App.Div. 1993), certif. granted, 135 N.J. 304, 305, 639 *60 A.2d 304 (1994). "[I]f an indictment alleges all the essential facts of the crime, the charge is sufficiently stated and the indictment should not be dismissed unless its insufficiency is `palpable.'" New Jersey Trade Waste Ass'n, supra, 96 N.J. at 19, 472 A.2d 1050. A trial court's exercise of this discretionary power will not be disturbed on appeal "unless it has been clearly abused." Weleck, supra 10 N.J. at 364, 91 A.2d 751 (citations omitted).
In State v. Ball we ruled that a subsequent finding of guilty by a properly instructed jury "represents a finding beyond a reasonable doubt that defendant[] w[as] guilty of the offense. Thus, even if the grand jury instructions were erroneous, the error was rendered harmless by the subsequent guilty verdict." Ball, supra, 268 N.J. Super. at 120, 632 A.2d 1222. "[P]rocedural irregularities in a grand jury proceeding are rendered harmless where defendant is ultimately found guilty by petit jury." Ibid. (citing State v. Lee, 211 N.J. Super. 590, 599-600, 512 A.2d 525 (App.Div. 1986)); accord United States v. Mechanik, 475 U.S. 66, 70, 106 S.Ct. 938, 941, 89 L.Ed.2d 50, 56 (1986); State v. Laws, 262 N.J. Super. 551, 563, 621 A.2d 526 (App.Div. 1993).
The grand jury was given the charge against the defendant and the elements of the crime. Even assuming error occurred, that error is harmless given the subsequent conviction of defendant by the petit jury.

II.
Defendant's argument that the trial court erred in failing to dismiss the indictment because it did not charge the "alternate" offense of manslaughter is clearly without merit. R. 2:11-3(e)(2).
"[A] lesser-included offense ... need not be separately charged in the indictment." State v. Mann, 244 N.J. Super. 622, 628, 583 A.2d 372 (App.Div. 1990). Reckless manslaughter is a lesser included offense of aggravated manslaughter, State v. Reed, 211 N.J. Super. 177, 183, 511 A.2d 680 (App.Div. 1986) (citing N.J.S.A. 2C:11-4a), certif. denied, 110 N.J. 508, 541 A.2d 1368 *61 (1988), and therefore need not have been included in this indictment.

III.
Defendant argues that the trial court erred in failing to rule inadmissible his statements to Officer Bramble. He claims that he did not waive his Miranda rights because he refused to sign the waiver card and because he was too intoxicated to knowingly and intelligently waive his rights. Defendant contends that the refusal to sign the form amounted to an assertion of his Fifth Amendment rights that requires the suppression of his subsequent statements.
The two statements at issue are the formal transcribed statement defendant gave to Investigator Mazza and the oral statement to Officer Bramble. At the suppression hearing, Officer Bramble testified that, after he smelled alcohol on defendant's breath and defendant admitted that he had been drinking, he placed defendant under arrest and informed him of his Miranda rights. Defendant responded that he understood his rights. On the way to the police station, defendant, without any questioning, offered the explanation for damage to his car was caused by someone who had shot his windshield.
At the police station, Bramble again read defendant his Miranda rights but defendant refused to sign the waiver card. Bramble then asked defendant how much he had to drink and defendant responded that he had a couple glasses of chablis in Montclair about 45 minutes apart between 1:00 p.m. and 4:00 p.m. Bramble testified that although defendant was obviously intoxicated, his answers were responsive and he understood the questions.
The judge found that the initial statements to Bramble were admissible as on-the-scene investigative and non-custodial statements, and that defendant's refusal to sign the waiver card before the subsequent questioning at the police station was not an assertion of the right to remain silent. Therefore, the court ruled *62 the statements admissible, finding that defendant understood what was happening and was able to communicate. These findings are binding on this court if they are supported by adequate and credible evidence particularly because "the significant evidence is largely testimonial rather than documentary, and the trial court has had the opportunity to observe the witnesses and determine their credibility." Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607, 560 A.2d 655 (1989). These findings are supported by adequate and credible evidence in the record found in the testimony of the officers and other witnesses. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
Miranda does not require a written waiver. Klingler v. United States, 409 F.2d 299, 308 (8th Cir.1969); cert. denied 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); State v. Graham 59 N.J. 366, 376-77, 283 A.2d 321 (1971); State v. Cooper, 211 N.J. Super. 1, 22, 510 A.2d 681 (App.Div. 1986).
In State v. Adams, 127 N.J. 438, 446, 605 A.2d 1097 (1992), defendant told a detective that although he did not wish to sign a written statement, he would talk about the incident. He claimed that his writing, "I do not wish to give a statement at this time," invoked his right to silence." Ibid. The Court held, however, that defendant never invoked the right to silence beyond his refusal to sign a written statement. Ibid.
In Cooper we found that despite defendant's statement that he would not sign any statement, it did not render his subsequent confession inadmissible when he subsequently signed three separate properly administered Miranda waivers on three separate occasions. Cooper, supra, 211 N.J. Super. at 22, 510 A.2d 681.
The voluntariness of defendant's waiver is tested by the totality of all the surrounding circumstances. See State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978). Although the question of whether a refusal to sign a written acknowledgement that Miranda warnings have been given is apparently a matter of initial impression in New Jersey, the federal courts have consistently *63 held that such a refusal does not preclude a finding of waiver. "[F]ailure to sign a form of waiver does not preclude a finding of waiver, nor does it make further questioning a violation of defendant's constitutional rights." United States v. Filiberto, 712 F. Supp. 482, 487 (E.D.Pa. 1989) (finding statements voluntary despite refusal to sign waiver card because defendant responded to subsequent questions without requesting counsel or invoking the right to remain silent and no evidence of police coercion existed); accord North Carolina v. Butler, 441 U.S. 369, 373-75, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292-93 (1979) (ruling that an express written waiver is "strong proof" of valid waiver but is not necessary to establish waiver and noting that "it appears that every court that has considered this question has now reached the same conclusion"); United States v. McKinney, 758 F.2d 1036, 1045 (5th Cir.1985) (ruling that refusal to sign waiver form by itself is not an assertion of the right to counsel or to remain silent); United States v. Bosby, 675 F.2d 1174, 1182 n. 13 (11th Cir.1982) (stating that once informed of his rights, a defendant "has the burden of indicating in some manner that he wishes to remain silent" and that defendant who merely refused to sign waiver card had not affirmatively invoked the right to remain silent and ruling that "[n]or does the failure to sign the written waiver form demonstrate that the waiver was involuntary"); United States v. Klein, 592 F.2d 909, 914 n. 10 (5th Cir.1979) ("mere refusal to sign a waiver form does not make further inquiry illegal"); United States v. Stewart, 585 F.2d 799, 800 (5th Cir.1978) (rejecting defense claim that refusal to sign waiver card rendered subsequent statements inadmissible when defendant was fully informed of his rights and understood them and expressed a willingness to discuss the crime), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); United States v. McDaniel, 463 F.2d 129, 135 (5th Cir.1972) ("[a] refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody"), cert. denied, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); United States v. Ellis, 457 F.2d 1204, 1207 (8th Cir.1972) (stating that a refusal to sign a waiver is only one factor *64 to be considered in determining whether a defendant waived his rights); Klingler v. United States, supra, 409 F.2d at 308 ("Miranda does not require a written waiver, but only a waiver made `voluntarily, knowingly and intelligently.'").
Defendant erroneously relies on United States v. Heldt, 745 F.2d 1275 (9th Cir.1984). In that case, the court cautioned that in some situations a refusal to sign a waiver card creates an ambiguous circumstance and may be an assertion of the right to remain silent because the ambiguity could imply that defendant discussed the matter after his refusal, thinking that his refusal precluded the use of his statements against him. Id. at 1277-78. In Heldt, however, the refusal to sign the waiver card was accompanied by testimony of the defendant that he said he refused to sign the card because he did not want to waive his rights because he was not "sure what was going on yet." Id. at 1277 n. 3. The totality of the circumstances in that case indicate that the defendant intended to invoke his right to remain silent. Defendant in this case willingly discussed his drinking without any indication that he intended to invoke his right to remain silent.
Finally, testimony indicated that, although defendant was very intoxicated, he was capable of communicating and that he was responsive in answering questions and could answer correctly questions such as his name, age, etc. The court found that this testimony was credible and that the evidence indicated a knowing and intelligent waiver given defendant's continued discussion of the matter. This finding is supported by substantial credible evidence in the record. See Bonnco, supra, 115 N.J. at 607, 560 A.2d 655.

IV.
Defendant concedes that a driver arrested by a police officer who has probable cause to believe that defendant is intoxicated has no "constitutional right to prevent the involuntary taking of a blood sample." Defendant contends, however, that the *65 manner in which his blood samples were taken violated the rule in Schmerber v. California, 384 U.S. 757, 770-71, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 919-20 (1966), because he "violently opposed the taking of blood to such a degree that the nurse on duty transferred this responsibility to a medical technician" and that the continual prodding and pressure placed on him by police to get him to submit to the test invited "abuse and possible injury" and therefore the evidence should be stricken.
Defendant is procedurally barred from making this argument because he did not raise it below, R. 2:10-2, and it is also clearly without merit. R. 2:11-3(e)(2).
Defendant was uncooperative and antagonistic and initially refused to submit to the blood test until a doctor persuaded him. Curry testified that he and the physician told defendant that he would be physically restrained in order to take the blood sample if he did not cooperate and that defendant thereafter submitted to the test. The doctor who took the blood testified that defendant "did not physically resist having it drawn."
Although the record does reflect defendant's unwillingness to give a blood sample and the nurse's fear of taking the sample because defendant told her he would not allow her to take his blood, nothing in the record reflects any violent behavior or physical resistance to having the blood drawn.
Under both federal and state law, the State may force a suspect to a undergo a blood test to determine the amount of alcohol in his blood. Schmerber v. California, supra, 384 U.S. at 770-71, 86 S.Ct. at 1836, 16 L.Ed.2d at 920; State v. Stever, 107 N.J. 543, 558, 527 A.2d 408 (1987), cert. denied, 484 U.S. 954, 108 S.Ct. 348, 98 L.Ed.2d 373 (1987); State v. Dyal, 97 N.J. 229, 238-39, 478 A.2d 390 (1984); State v. Macuk, 57 N.J. 1, 14, 268 A.2d 1 (1970). "[A]cquiescence is not legally significant or necessary." Macuk, supra, 57 N.J. at 15, 268 A.2d 1. "Of course, the sample should be taken in a medically acceptable manner at a hospital or other suitable health care facility." Dyal, supra, 97 N.J. at 238, *66 478 A.2d 390; accord Schmerber, supra, 384 U.S. at 771-72, 86 S.Ct. at 1836, 16 L.Ed.2d at 920 (deeming a reasonable manner to include the taking of blood by a physician in a hospital "according to accepted medical practices").
Herein, nothing indicates that any improper means were used to obtain the blood sample. Defendant had no legal right to refuse to submit to the blood test, the test was performed in a hospital by a physician and no injury or threat of injury was created by the procedure used. Therefore, this evidence was properly admissible.
Additionally, defendant claims that the destruction of the blood samples prohibited him from testing those samples. However, nothing in the record indicates that the defendant ever requested an opportunity to test those samples.

V.
Lastly, defendant's argument that the court should have entered a judgment of acquittal in his favor or alternatively ruled the verdict was against the weight of the evidence is clearly without merit. R. 2:11-3(e)(2). Defendant is procedurally barred from arguing that the verdict was against the weight of the evidence because he failed to make a motion for new trial, State v. Johnson, 203 N.J. Super. 127, 133, 495 A.2d 1367 (App.Div.), certif. denied, 102 N.J. 312, 508 A.2d 195 (1985); R. 2:10-1. Furthermore, the evidence supports the verdict.
Reckless manslaughter requires that the defendant recklessly cause the death of another. N.J.S.A. 2C:11-4b. Reckless conduct is defined as conduct in which the actor:
consciously disregards a substantial and unjustifiable risk that the material element [death of another] exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
[N.J.S.A. 2C:2-2b(3).]
*67 The evidence presented showed that defendant had a blood alcohol level of .238 about two hours after the accident. He drove from the scene of the accident leaving the victim without offering aid or attempting to send aid and, as several witnesses testified, drove erratically and dangerously back to his residence. This conduct is clearly a "gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."

VI.
In an untimely pro se supplemental brief, defendant argues that he was "illegally convicted of an illegal indictment, conceived and prosecuted with illegal evidence." We have carefully reviewed this brief and conclude that the arguments are clearly without merit. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The judge's oral opinion conflicts with the judgment of conviction. An error was made in the aggregate suspension by the fact that the judgment of conviction states six months for the conviction of leaving the scene of an accident whereas the transcript of sentencing shows "additional 18 months." In any event, the judge's oral opinion reflects the proper time and the oral opinion controls over the judgment of conviction. State v. Pohlabel, 40 N.J. Super. 416, 423, 123 A.2d 391 (App.Div. 1956). But the State did not cross-appeal.
[3] Defendant has not appealed from the convictions for motor vehicle offenses nor the sentences imposed.