NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0345-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MOHAMMAD RAMADAN,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**April 11, 2025**

**APPELLATE DIVISION**

Argued January 15, 2025 – Decided April 11, 2025

Before Judges Currier, Marczyk and Torregrossa-O'Connor.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 22-04-0373.

Lily W. Halpern, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Lily W. Halpern, of counsel and on the brief).

Deepa S. Y. Jacobs, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Deepa S. Y. Jacobs, of counsel and on the brief).

The opinion of the court was delivered by

TORREGROSSA-O'CONNOR, J.S.C. (temporarily assigned).

We granted defendant Mohammad Ramadan leave to appeal from the Law Division's April 4, 2024 order denying his motion to dismiss count two of an indictment charging him with first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3. Because we determine the grand jury was provided with incorrect and misleading instructions regarding attempted murder, we reverse.

I.

On April 13, 2022, a Bergen County grand jury returned an indictment charging defendant with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), count one; first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3, count two; third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2), count three; and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), count four. The charges stemmed from defendant's alleged attack on elderly victim, Ira Levine, that left him with head injuries and lasting cognitive impairment. We distill the following salient facts and procedural history from the records of the grand jury proceeding and the motion hearing.

A.

The State presented its case to the grand jury through the testimony of two witnesses, Fair Lawn Police Officer Robert Manning and Detective William Diedtrich of the Bergen County Prosecutor's Office (BCPO).

Officer Manning testified that on November 23, 2021, at approximately 2:45 p.m., he responded to an emergency call regarding a "fall victim at [Levine] [L]aw [F]irm." When Officer Manning arrived, he met with the victim's son, Joshua Levine, who directed Officer Manning to the then-seventy-nine-year-old victim sitting on the floor.[1] Officer Manning testified that he observed the victim "sitting against the wall very disoriented[] with a laceration to his face," and saw a "hole in the sheetrock behind where [the victim] was sitting." The officer explained that the victim could not recall how he ended up on the floor and appeared "disoriented" and "lethargic." Ultimately, the victim was transported to the hospital, and police later learned that he suffered an "acute intercranial hemorrhage, likely post traumatic, puncture of an artery in his face," "[f]ractured . . . facial bones[,] . . . and lost teeth." Officer Manning testified that he initially believed the victim had fallen.

According to Detective Diedtrich, investigators interviewed the victim at the hospital, who "remembered [defendant] coming to the building. . . . [and the victim] attempting to make small talk with [defendant] by referencing some photos on Facebook." Defendant was known to the victim and had

[1] As the victim and his son share the same last name, we refer to the victim and the victim's son by their first names. No disrespect is intended.

A-0345-24

regularly provided office computer repair services for the victim's law office for years. The victim described defendant as "disheveled," and recalled nothing else before "the next thing he knew[,] he woke up in the hospital."

Detective Diedtrich testified that the paralegal at the law office provided a formal statement at the BCPO, which was played for the grand jury. The paralegal explained she let defendant into the office because he "had been working [at Levine Law] for a long time[] [and they had] a good relationship," calling him "a long[-]term IT employee of the law firm." She observed defendant "holding a stick of some sort" and recalled he "did not park in [a] parking spot, but rather in the middle of the lot with the car running as if he did[ not] plan on staying."

The paralegal recalled defendant's speaking with the victim outside her office when "she heard [the victim] mention something about seeing [defendant] on Facebook and then she heard [a] thud." Defendant "only stayed a minute without [performing] any work on any computer" and then "quickly left." After defendant "walked out," the paralegal found the injured victim.

Detective Diedtrich stated that Joshua texted defendant later that day, asking defendant to "please call [him] back." Screenshots of text messages between defendant and Joshua were introduced to the grand jury, showing defendant texted Joshua the following day, stating:

I'm losing my mind, dear, God, please, what the f[***] have I done, I don't know what's going on, please tell me what's going on with him, please, please, please, I'm paralyzed, please tell me how Ira is please. Dear God, dear God, please, Josh, I beg you.

Joshua then called defendant and recorded their conversation. A transcript of that call was presented to the grand jury, reflecting Joshua pleading with defendant to tell him "why this . . . happened." Defendant responded that "it was out of [his] control . . . . [He] came in there to help the man" but "d[id not] know what happened," and "maybe God [wa]s trying to show [him] that maybe [he] was denying such a thing as the devil and [he] d[id not] know what got over [him]."

B.

At the conclusion of the proceeding, the assistant prosecutor instructed the grand jury regarding the law applicable to each count. In pertinent part, the prosecutor first advised the grand jurors that defendant was charged with attempted murder. The prosecutor then instructed the grand jury on the charge of attempted murder, beginning with its request that they find defendant intended to cause the victim's death, stating:

The second count that we're asking you to consider is one count of attempted murder.

. . . .

So we're asking you to consider that it was . . . defendant's purpose to cause the death of the victim. And if you find [defendant] purposefully engaged in conduct, which was intended to cause the death of the victim, if the intended circumstances were as a reasonable person would believe them to be, or they did or omitted to do anything for the purpose of causing the death of the victim without further comment on their part.

We ask you to find that it was . . . defendant's purpose to cause the death of Ira Levine, and that he purposefully engaged in conduct which was intended to cause his death, by attacking the victim in the office, the victim being [seventy-nine] years old.

The prosecutor then continued, stating that attempted murder could be satisfied by two separate types of intent:

[I]f there's an attempt for the actor to purposefully cause death <u>or serious bodily injury resulting in death</u> or attempt to cause death <u>or serious bodily injury resulting in death</u>, this <u>attempted murder is committed when the actor</u> acting either alone or with one or more other persons <u>is engaged in the commission of activities that could cause the injury that could result in death.</u> This is again, [defendant] is alive, so we're asking you to consider this as an attempt.

[(Emphasis added).]

The prosecutor then continued stating, in pertinent part:

Whether or not . . . defendant's purpose was to cause the death of the victim is a question of fact for you to decide. Purpose is a condition of the mind which cannot be seen. It can only be determined by inference from conduct, words or acts.

6

It is not necessary for the State to produce a witness or witnesses who could testify that . . . defendant stated, for example, that his purpose was to cause the death of the victim. It's within your power to find that proof of purpose has been furnished through the probable cause standard, that may arise from the nature of the act and the surrounding circumstances.

. . . .

Causing the death of a victim must be within the design or contemplation of . . . defendant. If you find there was use of a deadly weapon which in th[is] case, there is an allegation that [defendant] had a wooden baton[-]like object with him, should weigh in your evaluation of whether or not you feel that the purpose was to cause the death of the victim.

In your deliberations, you may consider the weapon used and the ma[nn]er and circumstances of any attack, and if you're satisfied, you may draw an inference from the weapon used as to . . . defendant's purpose.

[(Emphasis added).]

At the conclusion of the legal instructions, a grand juror asked, "[w]as there any indication[,] maybe from previous customers[,] . . . that [there was] b[izarre] behavior from [defendant], or any aggression, or any other customers that he serviced?" The prosecutor responded, "[n]o. There's no evidence as to [defendant] having any work issues. There was a phone call made to the employer when they were looking for him and there's a brief exchange that is

documented, but there's nothing to indicate anything about [defendant] having . . . . previous negative work issues."

The grand jurors deliberated for several minutes and sent a request for a "rereading [of] the law" on attempted murder. The assistant prosecutor then provided the following instructions:

> [A]n act . . . constitutes murder when the act purposefully causes death <u>or serious bodily injury resulting in death. So attempting to cause death or attempting to cause serious bodily injury resulting in death[] . . . is obviously an attempt</u> in this case because Ira Levine did not die.
>
> . . . [I]n order for you to bill . . . defendant for attempted murder, you must find probable cause that it was defendant's purpose to cause the death of the victim.
>
> . . . .
>
> And again, whether . . . defendant purposefully caused the death of the victim is a question for you to de[c]ide. Purpose of the condition of the mind which cannot be seen and can only be determined by inference from conduct, words or acts.
>
> It is not necessary for the State to produce a witness or witnesses who can testify that . . . defendant stated for example, that his or her purpose was to cause the death of the victim. It's within your power as grand jurors to find that proof of the purpose has been furnished to the probable cause standard, by inference which may arise from the nature of the act and the surrounding circumstances, such things as a place where the acts occurred, the weapon used at [the] location, number and nature of

wounds inflicted and that all that was done or said by . . . defendant preceding, connecting with and immediately proceeding the event are among circumstances that you may consider.

Causing the death of the victim must be within the design or contemplation of . . . defendant. And again[,] . . . you don't have to find that there was a weapon, but if you do find that there was a weapon, you can make an inference that that would inure towards an attempted murder.

[(Emphasis added).]

Grand jurors then inquired about the extent of defendant's injuries, asking, "[w]as there ever a question of whether or not [the victim was] going to make it," and another inquiring, "[was] there any other evidence of bodily injury, like to other regions of the body?" Detective Diedtrich returned and clarified that the victim's injuries "could . . . have been fatal," and he did not recall injuries beyond those to the head and face. The grand jury then returned an indictment on all proposed counts.

## C.

Defendant moved to dismiss count two of the indictment, and his argument before the Law Division was two-fold. He first asserted that "incorrect legal instructions were provided regarding the requisite purpose for attempted murder." Defendant highlighted the assistant prosecutor's advising that an intent to cause "serious bodily injury" was a sufficient mental state was

"blatantly wrong" and "not merely incomplete or imprecise." Defendant emphasized the prosecutor "never explicitly repudiated" or expressly corrected the faulty instruction, and instead provided contradictory instructions that further confused the grand jury as evidenced by the jurors' request for the law on attempted murder and the subsequent questions regarding the seriousness of the victim's injuries.

Defendant cited to State v. Gilliam, 224 N.J. Super. 759 (App. Div. 1988), in which we reversed the defendant's attempted murder conviction based on an incorrect attempted murder jury charge because the language regarding the actor's required purpose "was subject to multiple, inconsistent interpretations by the jury." Id. at 763. Defendant likened the incorrect instructions here to those in Gilliam, because the jury instruction there had similarly defined the requisite purpose of attempted murder as "to cause the death of [the victim], or to cause serious bodily injury resulting in the death of [the victim]." Ibid. (emphasis added).

The State argued the assistant prosecutor stated numerous times the correct mens rea, namely, that defendant must act with "purpose to cause the death of the victim." The State asserted that "when the grand jury request[ed] . . . additional reading of the law . . . [and] the prosecutor instruct[ed] the grand jurors, again, on attempted murder[,] she first g[ave]

them . . . the law on criminal homicide."  According to the State, although the prosecutor made two isolated references to an alternative "attempt to cause serious bodily injury," those misstatements, taken with the remainder of the instructions, did not render the charge "blatantly wrong."

Defendant next claimed the prosecutor withheld exculpatory information from the grand jurors and did not provide instructions regarding the affirmative defenses of insanity and diminished capacity when one of the jurors asked whether defendant had previously demonstrated "bizarre" or "aggressi[ve]" behavior.  Defendant claims the prosecutor did not answer truthfully, as a witness had told police defendant's behavior was "bizarre in the months leading up to this."  According to the witness, "on the day [defendant] came here he was bizarre, and he was disheveled, and it looked like [he] had been dropped out of a spaceship."  The State countered noting it had no "obligation to present any type of mental evidence [to] the grand jury" and "to tell a grand jury that there is something going on mentally . . . with a defendant . . . would be misleading [to] the grand jurors, because we don't know what his mental state is."

In the court's oral decision denying defendant's motion, the court considered the legal instructions and found:

> the average grand juror could fully recall and understand the elements of attempted murder they

11

were considering[,] particularly[] since the prosecutor provided specific, clear, and correct instructions on that particular crime before the vote and clarified multiple times on at least ten occasions the correct statement of the law within literally seconds after including that . . . serious bodily injury language thereby, correcting any misimpression of the legal elements of the crime.

The court reviewed the grand jury hearing transcript and determined the references to "serious bodily injury, in the totality of the circumstances . . . [did] not render the charge completely flawed." It counted the number of times the prosecutor used accurate language to find those correct statements "thereby[] cur[ed] the prior misstatement."

The court found Gilliam distinguishable as it involved "an erroneous . . . instruction to the petit jury, which the Appellate Division found the jury relied on since there was no other instruction."

The court further determined the prosecutor's failure to "offer the evidence from the lay witness about . . . defendant acting bizarre" and telling the grand jury instead that there was no such evidence "d[id] not negate that this defendant was determined by the grand jury to have acted with a purpose to kill the alleged victim."

12

II.

On appeal, defendant raises the same issues for our consideration:

POINT I

THE TRIAL COURT INCORRECTLY DENIED DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT WHERE THE STATE INCORRECTLY INSTRUCTED THE GRAND JURY ON THE REQUISITE PURPOSE FOR ATTEMPTED MURDER.

POINT II

THE TRIAL COURT INCORRECTLY DENIED DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT WHERE THE STATE INTERFERED WITH THE GRAND JURY'S DECISION-MAKING FUNCTION BY GIVING A FALSE RESPONSE TO A QUESTION.

POINT III

THE INTERESTS OF JUSTICE REQUIRE IMMEDIATE APPELLATE REVIEW.

III.

We review the trial court's decision on defendant's motion to dismiss the indictment for an abuse of discretion. State v. Saavedra, 222 N.J. 39, 55 (2015). "A trial court's exercise of this discretionary power will not be disturbed on appeal 'unless it has been clearly abused.'" Id. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)). "However, our review of a trial judge's legal interpretations is de novo." State v. Eldakroury,

439 N.J. Super. 304, 309 (App. Div. 2015) (citing State v. Grate, 220 N.J. 317, 329-30 (2015); State v. Drury, 190 N.J. 197, 209 (2007)); see also State v. Twiggs, 233 N.J. 513, 532 (2018) (recognizing when a decision to dismiss an indictment hinges on a purely legal question, we need not defer to the motion court's interpretations (citing State v. S.B., 230 N.J. 62, 67 (2017))).

Courts "should dismiss an indictment only on the clearest and plainest ground, and only when the indictment is manifestly deficient or palpably defective." Twiggs, 233 N.J. at 531-32 (quoting State v. Hogan, 144 N.J. 216, 228-29 (1996)) (internal quotation marks omitted). Generally, "[a]s long as the State presents 'some evidence establishing each element of the crime to make out a prima facie case,' a trial court should not dismiss an indictment." State v. Nicholson, 451 N.J. Super. 534, 541 (App. Div. 2017) (quoting State v. Feliciano, 224 N.J. 351, 380 (2016) (citations omitted)).

"[A] deficiency premised upon alleged prosecutorial misconduct does not require dismissal of an indictment '[u]nless the prosecutor's misconduct . . . is extreme and clearly infringes upon the [grand] jury's decision-making function.'" State v. Bell, 241 N.J. 552, 560-61 (2020) (alterations in original) (quoting State v. Murphy, 110 N.J. 20, 35 (1988)). Moreover, "'[b]ecause grand jury proceedings are entitled to a presumption of validity,' defendant bears the burden of demonstrating the prosecutor's conduct

14

requires dismissal of the indictment." State v. Majewski, 450 N.J. Super. 353, 365 (App. Div. 2017) (quoting State v. Francis, 191 N.J. 571, 587 (2007)).

"Incomplete or imprecise grand-jury instructions do not necessarily warrant dismissal of an indictment; rather, the instructions must be 'blatantly wrong.'" State v. Triestman, 416 N.J. Super. 195, 205 (App. Div. 2010) (quoting State v. Hogan, 336 N.J. Super. 319, 344 (App. Div. 2001)). "In short, an indictment will fail where a prosecutor's instructions to the grand jury were misleading or an incorrect statement of law." Ibid; see also State v. Tucker, 473 N.J. Super. 329, 344 (App. Div. 2022).

IV.

We first address defendant's argument that the court erred in denying his motion to dismiss the attempted murder charge based on the prosecutor's misstatements regarding the mens rea required for attempted murder.

Here, the legal instructions on the requisite intent were, at times correct, and on two occasions "blatantly wrong." See Triestman, 416 N.J. Super. at 205 (quoting Hogan, 336 N.J. Super. at 344). The prosecutor first accurately asked that the grand jury "consider that it was . . . defendant's purpose to cause the death of the victim." The legal instruction that followed, however, incorrectly provided an alternative intent, specifically, to purposefully cause "serious bodily injury," erroneously advising:

> [I]f there's an attempt for the actor to purposefully cause death <u>or serious bodily injury resulting in death or attempt to cause death or serious bodily injury resulting in death</u>, this <u>attempted murder is committed when the actor</u>[,] acting either alone or with one or more other persons[,] <u>is engaged in the commission of activities that could cause the injury that could result in death.</u> This is again, [the victim] is alive, so we're asking you to consider this as an attempt.
>
> [(Emphasis added).]

The prosecutor did not correct this misstatement, instead adding the correct, but potentially confusing, instructions that "[w]hether or not . . . defendant's purpose was to cause the death of the victim is a question of fact for you to decide" and "[c]ausing the death of a victim must be within the design or contemplation of . . . defendant."

Mindful of our deferential standard in reviewing the trial court's discretionary determinations, we conclude the motion court's finding that the instruction as a whole "cur[ed] the prior misstatement" was not supported by the record, as the grand jury could have mistakenly determined an attempt to purposely cause serious bodily injury resulting in death, rather than an intent to cause death, would suffice to sustain a charge of attempted murder. The grand jurors were not equipped as instructed to identify and disregard the critically incorrect instruction of alternative intent no matter how many times the correct mens rea was repeated. When assessing the impact of an incorrect

16

instruction on the charge as a whole, ours is a qualitative, not a quantitative, analysis.

We are informed by our prior decision in Gilliam, 224 N.J. Super. at 763, in which we considered, albeit in the context of a petit jury instruction, the same error in providing alternative purposes for attempted murder. There we determined, even in the absence of an objection to the jury charge,

> [t]he crime of murder under N.J.S.A. 2C:11-3 does not require a specific intent to kill. Purposely or knowingly committing serious bodily injury when death results is a sufficient element. In the crime of attempted murder, no death results. The jury charge before us on this appeal was subject to multiple, inconsistent interpretations by the jury. The jurors may have understood that they could reach a verdict of guilty if death was a possibility, however remote, as the result of the bodily injury inflicted on the victim. That interpretation, while logical, would have been contrary to law and prejudicial to defendant. The crime of attempted murder should be limited to attempts to cause death.
>
> [Ibid.]

Here, even in the grand jury context and bracketed between otherwise correct statements of law, we find the same risk was present. See generally State v. Savage, 172 N.J. 374, 387 (2002) ("The standard for assessing the soundness of a jury instruction is 'how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary . . . jurors understand the instructions as a whole.'" (quoting Crego v. Carp, 295 N.J.

Super. 565, 573 (App. Div. 1996))). The grand jury could have misunderstood the correct instructions as merely applicable to what it was incorrectly told was an alternative pathway of proving attempted murder by demonstrating an intent to cause death, when, under the law, it is the only route.

This concern is heightened by the grand jury's requesting that the prosecutor "reread" the law of attempted murder, evidencing the possibility of confusion. The prosecutor then compounded the issue by referencing the mental state for murder, N.J.S.A. 2C:11-3, which permits the alternative mens rea of purposely causing "serious bodily injury resulting in death." Specifically, the prosecutor stated, "an act . . . constitutes murder when the act purposefully causes death or serious bodily injury resulting in death," erroneously adding, "[s]o attempting to cause death or attempting to cause serious bodily injury resulting in death[] . . . is obviously an attempt in this case because Ira Levine did not die." (Emphasis added).

Although the prosecutor next instructed that the grand jury had to "find probable cause that it was defendant's purpose to cause the death of the victim," we are not persuaded that this cured the potential confusion caused by the prior incorrect and misleading statements. The grand jury's questions after beginning deliberations sufficiently suggest some uncertainty remained. Cf. State v. Frisby, 174 N.J. 583, 600 (2002) (recognizing in a petit jury trial "if a

18                                                                                    A-0345-24

jury affirmatively evidences 'confusion' by its questions . . . that would be an important factor in determining whether" error in the jury instruction was prejudicial). We note the trial court failed to address the grand jurors' inquiry or the prosecutor's misleading response in reaching its conclusion that the incorrect jury instructions did not require dismissal of the count.

We are not satisfied, when considering the critical misstatements, the instructions as a whole, the nature of the grand jury's questions, and the misleading answers provided, that, without further clarification, the grand jury possessed the capacity to reconcile the incorrect instructions with the proper instructions. Consequently, we cannot escape the inherent intolerable possibility that the instructions may have caused the jury to indict defendant for attempted murder without finding defendant possessed the requisite purpose to cause death.

Persuaded that the misstatement of law requires reversal and dismissal of the attempted murder charge, we need not reach defendant's remaining claim that the prosecutor withheld exculpatory evidence as it pertains only to the attempted murder charge we now dismiss.

We reverse the order denying defendant's motion to dismiss count two of the indictment. Our opinion does not preclude, if appropriate, the State's re-

19

presenting this matter to another grand jury. <u>See</u> <u>Tucker</u>, 473 N.J. Super. at 349.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division