764 A.2d 1012 (2001)
STATE of New Jersey, Plaintiff-Appellant,
v.
John HOGAN and James Kenna, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2000.
Decided January 5, 2001.
*1014 Richard W. Berg, Assistant Attorney General, argued the cause for appellant (John J. Farmer, Jr., attorney; Mr. Berg, on the brief).
Philip De Vencentes, Hackensack, argued the cause for respondent John Hogan (Galantucci & Patuto, attorneys; Mr. De Vencentes, on the brief).
David W. Fassett, Chatham, argued the cause for respondent James Kenna (Arseneault & Fassett, attorneys; Mr. Fassett, on the brief).
Before Judges BAIME, WALLACE, and CARCHMAN.
*1013 The opinion of the court was delivered by BAIME, P.J.A.D.
This appeal presents novel questions concerning the existence and scope of a prosecutor's duty to instruct a grand jury on the law relating to defenses and justifications. Also at issue is whether the indictment against defendants was tainted by prosecutorial misconduct. In dismissing the indictment, the judge determined that the deputy attorney general inadequately charged the grand jury on self-defense, defense of others and the use of force in law enforcement. The judge also concluded that the deputy attorney general impinged upon the independence of the grand jury and improperly influenced its determination. We find no basis in the record for the judge's conclusions. We thus reverse the judgment entered and reinstate the indictment.

I.
Defendants John Hogan and James Kenna are New Jersey State Troopers. On September 7, 1999, the State Grand Jury returned an indictment charging both defendants with attempted murder (N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)) and separate counts of aggravated assault (N.J.S.A. 2C:12-1b(1)). The attempted murder charge against Hogan was subsequently dismissed at the State's behest. Our concern here is with the remaining charges.
The indictment had its genesis in the events of April 23, 1998. At 9:00 p.m., defendants were assigned to patrol a stretch of the New Jersey Turnpike. Hogan, who had been a trooper since 1993, drove the marked State Police vehicle, and *1015 Kenna, who had been a trooper since 1994, was in the front passenger seat. Both officers were in uniform. The night was dark and a light rain was falling.
According to defendants' statements, while traveling south, the troopers encountered a light-colored minivan driving at a high rate of speed in the center lane. After briefly following the van, the officers activated the police car's overhead lights in order to effectuate a traffic stop. The van suddenly slowed and then eased its way to the shoulder of the road. Illuminated by the spotlight on the troopers' car, both defendants observed the occupants of the van moving about, thus putting defendants in a heightened state of readiness. Hogan in particular was concerned because he saw two people reaching toward the lower portion of the van and behind the seat.
The troopers stopped their vehicle approximately ten feet behind the van. Kenna leapt from the car, drew his firearm and ran to the front passenger side of the van. While shining his flashlight in the passenger side window, Kenna ordered the occupants of the van to put their hands up. According to Kenna, the front passenger, Danny Reyes, was bent over and appeared to be reaching toward the center rear floor area. Kenna also noticed the driver, Keshon Lamont Moore, peering down the driver's side of the van, and the middle and rear seat passengers, Leroy Germaine Grant and Rayshawn Brown respectively, moving about the van. Kenna claimed that he repeated his order for everybody to put their hands up, but none of the occupants complied. Kenna then struck the passenger side window several times with his flashlight in order to break it and obtain a better view.
While Kenna was occupied by these events, Hogan exited the police vehicle with his flashlight in his right hand. As he positioned himself between the rear of the van and the front of the police car, Hogan noticed Moore looking at him in the rearview mirror. Moore had his left hand on the steering wheel and his right hand on the gear shift. Hogan claimed that he observed Moore's right arm move, and heard the wheels of the van spinning wildly. The van rapidly accelerated toward him. Hogan asserted that he dove headfirst to his left, but was struck by the van in the lower right leg area. Hogan's torso was in the right southbound lane of traffic.
From his vantage point on the passenger side of the van, Kenna could not see Hogan, but he nevertheless assumed that his partner was in danger. Upon hearing the van's wheels spinning, Kenna fired his weapon at the driver through the passenger side window. Although Hogan asserted that he remained silent while these events were unfolding, Kenna claimed that he heard his partner screaming from the rear of the van and assumed that he had been, or was about to be, run over. Kenna stated that his first shot pierced the passenger side window, leaving a spider-webbed crack that obstructed his view of the inside of the van. At this point, the van rammed the front of the police car. Kenna claimed that he repeatedly fired his weapon in order to save Hogan's life and to prevent the van from moving into a lane of traffic. Kenna could not recall how many times he fired his handgun.
The van then accelerated forward. Kenna was able to clear the shards of the broken glass from the passenger side window. The front passenger, Reyes, was reaching down into the rear center area, and the driver, Moore, had partially removed himself from the driver's side. When Reyes turned toward Kenna, the officer fired another shot. According to Kenna, Reyes then moved to the driver's seat and put the van in reverse. Kenna fired another shot at Reyes, while Moore jumped into the rear seat. The van started backing toward Hogan and the front of the police car.
Hogan was lying in the roadway when the van came to a complete stop. According to Hogan, while attempting to crawl backward, he found himself in the right *1016 lane of traffic. The van appeared to accelerate in reverse again, coming directly at him. As Hogan crawled backwards in an attempt to avoid being hit by the van, he drew his service weapon and fired at the driver of the vehicle. Hogan continued to fire his weapon until the van narrowly missed him. In his statement, Hogan asserted that he was "scared to death" that he would be killed.
The van again collided with the police car, which had been left in neutral, and was pushed backward approximately forty feet. Kenna positioned himself adjacent to the passenger side of the police car, and reloaded his weapon. Hogan was directly in front of him in the vicinity of the left front corner of the police car. After colliding with the police car, the van continued in reverse, veering perpendicularly into the roadway. Ultimately, the van was struck by a passing car, causing it to roll down an embankment and crash into several trees. Before the van came to rest, as it was passing the troopers, Kenna heard one of the occupants scream, "please don't shoot me, I don't want to die." Although Kenna did not recall firing any shots as the van rolled by on its way to the embankment, Eric Jusino, the driver of the car that had collided with the van, remembered hearing a gunshot. We digress to note that Jusino was clearly mistaken in his recollection. Following the return of the indictment, newly discovered evidence disclosed that neither officer had been in a position to fire a shot at the van as it rolled toward the embankment. In any event, Jusino testified before the grand jury that he heard one of the officers exclaim that the van had tried to run him over. Heather Hendrickson, the passenger in Jusino's car, heard the officers say that they "had" to shoot.
After the van had come to a stop, Kenna ordered all of the occupants to put their hands up. Hogan overheard one of the occupants apologizing for almost running over the troopers. Kenna handcuffed the occupants and called for assistance. No weapons or drugs were found in the van.
The testimony of the occupants of the van partially converged with the troopers' written statements, but markedly differed with respect to several key points. Moreover, the occupants' separate versions of this incident were not wholly congruent.
As we noted, Keshon Lamont Moore was the driver of the van. He and his passengers were on their way to North Carolina Central University in an attempt to obtain basketball scholarships. The mother of Moore's girlfriend had rented the van to enable Moore and his friends to reach their destination in Durham, North Carolina. Moore's driver's license had been revoked for failure to pay several parking tickets.
The van entered the New Jersey Turnpike at 9:45 p.m. Moore claimed that he was driving at fifty-five to sixty miles per hour, and the van was on cruise control. Moore first noticed defendants' police car approximately fifteen minutes later. It was positioned in the middle lane slightly in front of the van. Moore switched into the left lane and passed the police car. As he eased the van into the center lane, the police car pulled to the left and passed it. The police car then slowed until it was directly alongside of the van. The police car then allowed the van to pass it, and then followed the vehicle for a short distance before activating its overhead lights. Because there was traffic in the right lane, Moore was unable immediately to pull the van onto the shoulder. Once the traffic cleared, Moore gradually veered to the right and stopped the vehicle along the side of the roadway. Moore was unable to detect what was happening toward the rear of the van because the vicinity was heavily illuminated by the troopers' spotlight. Moore acknowledged that he was nervous because he was driving with a suspended license.
Moore testified that he tried to put the gearshift in park, but it apparently slipped into reverse. When Moore took his foot *1017 off the brake, the van rolled backward and hit the troopers' car. Moore then saw Kenna by the passenger side window. In an agitated state, Kenna was "shouting" and "banging" on the window. Because the windows were closed and music was playing from the radio, Moore could not hear what Kenna was saying.
Upon seeing the officer draw his firearm, Moore attempted to extricate himself from the driver's seat. Moore managed to position his torso behind the passenger seat in a diagonal direction, but the lower part of his body remained partially in the front seat. Moore noticed that Kenna's gun was trained on him. Moore then assumed a fetal position, curling his body behind the front bucket seats. Just as Moore lowered his head, he saw the front passenger side window break apart. Moore could not recall hearing the initial shot, but he remembered covering his head as he felt the van rolling backward.
Moore remembered hearing approximately five shots. He testified that he never tried to run over Hogan. Moore surmised that his foot had depressed the accelerator pedal, when he jumped into the back of the van. Moore recalled that the van collided with the police car and ultimately rolled down the embankment before it crashed into the trees and came to rest. He did not recall that the van was struck by Jusino's vehicle. Moore was not injured during the incident, but he heard his three friends crying in pain from the gunshot wounds they suffered. Moore felt that he was to blame, because he did not maneuver the gearshift into the park position and because he jumped out of the driver's seat to avoid being shot.
Danny Reyes was in the passenger seat. He first noticed the police car when it was directly in front of the van. As he watched, the police car moved to the left lane and then slowed until it was parallel to the van. Reyes looked at the van's speedometer which registered fifty-five miles per hour. He then noticed the police vehicle several car-lengths behind the van. Although the police car's overhead lights had been activated, Reyes did not believe that the signal to stop was directed at the van. However, after allowing traffic in the right lane to clear, Moore maneuvered the van onto the shoulder and stopped the vehicle.
According to Reyes, the four occupants remained in their seats awaiting the police officer. He then felt a "hard bump," and turned to the rear to determine what had happened. Reyes claimed that he heard a gunshot and the sound of the passenger side window breaking apart. As particles of glass rained in on him, Reyes was able to see a trooper standing approximately three feet away from the front passenger side of the van. Reyes claimed that he put his hands "straight up," saw the trooper looking directly at him, and assumed that he was no longer in danger. Reyes asserted that the trooper, Kenna, continued to fire his weapon, one shot piercing his arm. At that point, Reyes realized that the van was moving backward onto the roadway. Because he had been shot, Reyes was unsuccessful in attempting to push the gearshift into neutral. But Reyes was able to clutch the steering wheel and pull part of his body onto the driver's seat. The van then reversed direction and headed forward. Reyes saw a trooper, presumably Kenna, point a gun in his direction as the van proceeded down the embankment. Reyes claimed that he was shot again, this time in the back, just before the van landed in a ditch.
Reyes sustained five gunshot wounds. Two bullets entered Reyes' right forearm, fracturing two bones and tearing a blood vessel. Another bullet had pierced Reyes' upper thigh, leaving both entrance and exit wounds. There was also a bullet hole through Reyes' left arm, which lined up with the piercing wound through the left forearm. Another bullet had grazed Reyes' right upper chest or front shoulder. A fifth bullet had pierced the back seat of the van and had penetrated Reyes' back.
*1018 Rayshawn Brown was in the middle seat of the van. He was asleep on the far left side of the two-person bench seat, with his head propped against the window. Brown recounted that he was awakened by a gunshot, the bullet shattering the front passenger side window. Brown heard someone shout, "put your hands up," followed by a rapid series of gunshots. According to Brown, Moore asked Reyes to drive, and then jumped from the driver's seat to the floor. Pandemonium reigned. Brown felt the van moving slowly in reverse, ultimately striking some object. The van then reversed direction, slowly rolling down a hill, where it finally came to a stop. Brown testified that he opened the door to the van and was shot in the back, apparently as he was attempting to exit from the vehicle. The bullet tunneled through Brown's chest and entered his elbow.
Leroy Germaine Grant sat in the rear seat. He, too, had fallen asleep. Grant was awakened by flashing lights emanating from the troopers' vehicle. Grant remained in a semi-prone position. He suddenly felt a "nudge" from behind him. Then, gunshots rang out. Shards of glass showered the occupants of the van. Upon attempting to stand, Grant noticed that he could not bend his leg, which had been penetrated by a bullet. Grant tried to crouch on the floor, but the middle seat's reclining position prevented him from taking this evasive action. He was then struck by two more bullets. Grant observed Reyes with his hands raised, shouting, "don't shoot." Grant then felt a hard impact from the rear of the van, propelling it forward into a tree.
William Kenny, Jr. witnessed these events from a nearby overpass. He testified that he observed a van backing up and then heard gunfire. Kenny asserted that he saw someone on the driver's side of the van "dive for cover." According to Kenny, the van was traveling in a backward direction at a speed similar to that of a vehicle attempting to back out of a parking space. The van was rolling slowly enough to permit a pedestrian to escape from its path. Kenny asserted that he heard two sets of multiple gunshots. He claimed that he heard a solitary gunshot after the van proceeded off the side of the Turnpike toward the woods.
A mechanical examination of the van and troop car was performed by Lt. Frank Nucera, a police officer and forensic mechanic. Nucera concluded that the troop car had been left in neutral by Hogan when he stopped the vehicle behind the van. The troop car had a very slight compression of the shock pistons attached to the front bumper. The air bags were in working condition and had not been deployed. The front bumper and cover cowling were essentially undamaged. Based upon these circumstances, Nucera concluded that the van had impacted with the front of the troop car at a slow speed. This impact was consistent with the van being placed in reverse and moving at idle speed to the point of impact. Nucera testified that, given the design of the van, it would have been extremely difficult, if not impossible, for it to have accelerated to the point of spinning its wheels, as claimed by Hogan and Kenna in their sworn statements.
Inspection of the van's front tires did not reveal any evidence that they had skidded on the pavement. Nor did the tires disclose any indication of "heavy braking." The only indication of any wear was on the right rear tire, which revealed scuffing and grain marks from loose gravel.
Nucera characterized the van's gearshift pattern as unique. Nucera testified that the van had a "detent" mechanism that did not permit movement from one gear to the other without disengaging the gearshift. The witness testified that at times it was difficult to place the gearshift in park. The shift linkage was otherwise very sensitive and easy to move. Nucera recounted his experience as a police officer that drivers stopped for a traffic infraction often had difficulty placing their cars in park. This same sentiment was expressed by *1019 Kieran May, a State Trooper, who asserted that many drivers mistakenly put their cars into forward or reverse gear upon being stopped. Nucera and May attributed this problem to nervousness and inattentiveness.
Dr. Steven Batterman, a forensic engineer, testified with respect to the impact between the van and troop car. Like Nucera, Batterman found that the troop car had suffered only minimal damage. He estimated that the van's speed upon impact was four miles per hour. Batterman noted that the van would approach that speed "at idle" without any acceleration, particularly in light of the downward slope of the Turnpike at the site of the shooting incident. Batterman agreed with Nucera that the design of the van precluded it from spinning its wheels as described by defendants. This point was corroborated by Detective Sergeant John Repsha of the State Police, who performed experiments reenacting the movement of the van. The officers assisting Repsha were unable to make the van's tires "break free" or "squeal" on either a dry or wet surface.
Dr. Henry Lee, a forensic scientist, conducted experiments in the exact location of the shooting incident, using alternately the actual van, a duplicate van, the actual troop car, and a mannequin placed in the positions suggested by the evidence. Lee found that the van at idle speed pushed the troop car, which was left in neutral position, backward, and that it took twenty-five seconds from when the van first began to roll to when the troop car stopped at its final resting place.
Lee's experiments corroborated certain portions of the troopers' statements, but tended to disprove other portions. The same is true with respect to the varying accounts given by the occupants of the van. The experiments confirmed portions of their versions, but did not support other portions. For example, the location of particles of glass and blood stains corroborated Reyes' testimony that he managed to position his torso in the driver's seat, while his legs remained in the passenger compartment. Lee performed "trajectory" experiments which corroborated Kenna's and Hogan's statements indicating that the shot which had entered Reyes' back was fired while the van was on the roadway and not when the van came to rest in the ditch. Lee concluded that all shots were fired from a standing or semi-crouched position, not from the ground as implied by Hogan in his statement. All of Kenna's six shots were fired from a position near the front passenger window. The evidence suggested that the van was moving backwards at the time.
Lee testified that eleven shots were fired. The chronological order of the shots could not be determined. Only six casings were recovered from the scene. Six shots were fired from Kenna's gun and entered through the front passenger window. One shot went downward through the passenger window and wound up in the dashboard, and then at the driver's side door panel. Two separate shots went from the right to the left and entered Reyes's right arm. Another shot went from the front to the back, and from the right to the left, and hit Reyes' upper right thigh. A fifth shot went from the right to the left and into Reyes' right chest. A sixth shot went from the right to the left, and downwards into either Brown's right chest or arm.
The remaining five shots were fired from Hogan's gun. One went from the back to the front through the rear window of the van and hit Grant's back. Another went from back to front, through the rear window, and exited through the front windshield. Another went from back to front, and from left to right, slightly downward, and went through the left rear side window. It hit the middle seat, seat belt struts, and driver seat, and wound up in Reyes's back. Another shot went from left to right, back to front, and hit the door post. Another went from back to front, left to right, downward, through the left side rear window, and wound up in Grant's left knee.
*1020 The van was also in motion while Hogan fired his shots. Hogan had to change positions because two of his shots were from the rear and two were from the driver's (left) side. The fifth was from the left rear side. All five of Hogan's shots had an upward trajectory and were fired from a minimum height of three feet, five inches, which was consistent with the shooter standing or partially standing, and as we have noted, inconsistent with him lying or sitting on the ground.
Paul Manzo, a firearms instructor for the State Police, explained that all troopers must requalify twice a year for firearms training. This training includes teaching the officers when and when not to shoot. The training is derived both from the Code of Criminal Justice and from standard operating procedures of the State Police, memorialized in written form. Officers were taught that deadly force should be used only after all nonlethal means have been exhausted. Depending on the situation, and if the trooper exhausted all other means available to stop an individual, and if he felt his life, or that of another, was threatened or endangered, he would be justified in using deadly force. There had to be a reasonable belief that it was necessary to protect himself or another against death or serious bodily harm.
Officers were also taught the rule of accountability. This meant that troopers were accountable for every round they fired from their weapons. A trooper had to be aware of his target area, meaning what was in front of, behind, and next to, the target. Training was designed to ensure that innocent bystanders were not shot. Where there were multiple assailants, officers were taught how to engage them effectively. They were also taught to shoot at the center mass of their targets. Their intent was to stop the individual by incapacitating him or her. To do this, officers were trained to "double tap," meaning that they fired two rounds consecutively and then reassessed the situation.
Manzo also explained "sympathetic or panic fire." This occurs when an officer engages his weapon because he is not sure whether shots are being fired by the assailant or by his partner. It is a reaction to contextual events. Efforts are made to ensure that this does not happen.
Manzo also explained how a trooper should place his car when effectuating a motor vehicle stop. The troop car should be positioned about ten to twelve feet behind the suspect's vehicle, and canted out toward the left about three feet, in order to create an "alleyway" to ensure that no one is hit by oncoming traffic. The troop vehicle should overlap the suspect's vehicle by about three feet. For tactical purposes, the front wheels of the troop car should be turned to the left to afford further protection in case the suspects start to shoot. The troop car should be in park. In addition, the officers should radio in their stop so that the dispatcher will know where they are and what they are doing. A simple motor vehicle stop was considered low risk; however, any low risk stop could escalate into a high risk stop at any time. In a high risk stop, where the vehicle is known to be occupied by an armed suspect, the officer should position his vehicle a little farther away, should stay inside the door posts, and should use his public address system to direct the suspect or suspects to exit.

II.
The State Grand Jury convened on December 8, 1998. In the protracted proceedings that followed, the prospective grand jurors were thoroughly questioned to determine their ability to remain impartial. We need not describe these proceedings at length. Suffice it to say that the grand jurors ultimately selected to serve in this case were chosen carefully after prolonged and extensive questioning.
The deputy attorney general gave the grand jurors a brief introduction to the case on January 5, 1999. Among other *1021 things, the deputy attorney general described the grand jury proceedings as a "journey to the truth." The grand jury was cautioned that while the deputy attorney general was to serve as a "guide" in presenting the case and explaining the proofs, his comments did not constitute evidence. The deputy attorney general explained that the evidence consisted of the statements and live testimony of witnesses. The deputy attorney general noted that some of the evidence would be conflicting and contradictory, and that the "responsibility ... to determine where the truth lies rest[ed]" ultimately on the grand jurors. The grand jurors were told that they could propound written questions and seek supplementation of the deputy attorney general's presentation. The deputy attorney general repeatedly admonished the grand jurors to avoid any publicity in the case and to maintain the confidentiality of the proceedings.
The deputy attorney general provided the grand jury with an overview of the law pertaining to the factual issues. He stressed, however, that this discussion constituted a mere "smattering," and that he would provide the grand jury with "a full and complete" set of instructions at the conclusion of the case, before the grand jury commenced its deliberations. The deputy attorney general described the statutes dealing with attempted murder and aggravated assault and provided the grand jury with the requisite definitions. He also read various statutes dealing with self-defense and defense of others. In the context of these instructions, the deputy attorney general made brief references to the duty to retreat and mistake of law, a point that looms large in defendants' attack upon the integrity of the grand jury proceedings. We will come to these arguments later in this opinion. It suffices to note here that the deputy attorney general at the conclusion of his introductory remarks repeated his earlier admonition that his description of the law was designed merely to provide the grand jury with a passing "familiarity" with legal principles, and that he would provide a "detail[ed]" description of the applicable principles following his presentation of the evidence.
Testimony was presented on January 5, 1999 and February 2, 1999. The matter remained dormant until June 8, 1999. In the interim, a separate State Grand Jury returned an indictment charging both defendants with official misconduct and multiple counts of falsifying records. We have no occasion to describe that indictment in detail, except to note that the gist of the charges pertained to racial profiling. The intervening indictment was the subject of intense publicity. When the State Grand Jury reconvened on June 8, 1999, the grand jurors were carefully questioned by the deputy attorney general concerning whether they were aware of the intervening indictment and, if so, whether such knowledge would affect their capacity to be fair in considering the shooting incident. The transcript of these proceedings was given to Judge Feinberg, the Assignment Judge in charge of supervising the grand jury. She excused two of the grand jurors but found that the remaining members were untainted. We add that following their indictment, defendants moved to dismiss on the ground that the grand jurors had been contaminated by the intervening indictments. In a thorough and well reasoned opinion, Judge Feinberg found no merit in that argument.
Testimony continued before the grand jury for five additional days. At the conclusion of his presentation of the evidence, the deputy attorney general summarized the facts and provided a more complete set of instructions. We will describe these instructions later in this opinion. The deputy attorney general charged the grand jury generally on the justification of self-defense and defense of others. He did not repeat his earlier references to the duty to retreat and mistake of law. The deputy attorney general did not refer to the use of force in furtherance of law enforcement in his instructions on justification.

*1022 III.
Defendants moved to dismiss the indictment. The motion was granted by Judge Smithson in a written opinion. The opinion is ambiguous, and the parties differ in their interpretations of the judge's conclusions. Kenna asserts that the judge dismissed the indictment on three separate grounds: (1) the failure of the deputy attorney general to provide the grand jury with adequate instructions on the law, (2) the misconduct of the Attorney General's office in obtaining and releasing the intervening indictment, and (3) the improper conversion of the grand jury from an "accusative" to an "adjudicative" body. Hogan cites the same three grounds as forming the basis for the judge's decision. Hogan claims, however, that each basis for the judge's decision coalesces under the general rubric of prosecutorial misconduct. In Hogan's view, we must affirm even if we find that each separate basis for the dismissal of the indictment is insufficient when considered in isolation. We deem this distinction unimportant in light of our disposition of the issues. We note it here merely to preserve the parties' rights in the event of further appeal.

IV.
We begin our analysis by describing the grand jury's exalted status in the administration of the criminal law. Since early times, the right to indictment by grand jury has been enshrined in our Constitution and has played a central role in the enforcement of the criminal law. State v. Hogan, 144 N.J. 216, 227, 676 A.2d 533 (1996); See N.J. Const. of 1884, art. I, ¶ 9. The dual purpose of the grand jury is to bring the guilty to trial and protect the innocent from unfounded prosecution. State v. Hogan, 144 N.J. at 228, 676 A.2d 533; State v. Murphy, 110 N.J. 20, 29, 538 A.2d 1235 (1988); State v. Del Fino, 100 N.J. 154, 165, 495 A.2d 60 (1985); State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 27, 472 A.2d 1050 (1984); Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487-88, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Our Supreme Court has recognized that the grand jury is the "`primary security to the innocent against hasty, malicious and oppressive persecution.'" State v. Del Fino, 100 N.J. at 164, 495 A.2d 60 (quoting Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580 (1962)). Thus, the grand jury's mission is to "clear the innocent no less than to bring to trial those who may be guilty." United States v. Dionisio, 410 U.S. 1, 16-17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67, 81 (1973).
A grand jury is not an "officious meddler." In re Addonizio, 53 N.J. 107, 124, 248 A.2d 531 (1968). It is instead a "grand inquest," Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979, 983 (1919), whose power of inquiry is not bound by the rules of evidence. Because of the significant role of the grand jury in the administration of criminal justice, the courts have expressed a marked reluctance to intervene in the indictment process. See State v. Hogan, 144 N.J. at 228, 676 A.2d 533; State v. Perry, 124 N.J. 128, 168-69, 590 A.2d 624 (1991); State v. Long, 119 N.J. 439, 478, 575 A.2d 435 (1990); State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979); State v. LaFera, 35 N.J. 75, 81, 171 A.2d 311 (1961). Once the grand jury has acted, an "indictment should be disturbed only on the `clearest and plainest ground,'" State v. Perry, 124 N.J. at 168, 590 A.2d 624 (quoting State v. New Jersey Trade Waste Ass'n, 96 N.J. at 18-19, 472 A.2d 1050), and "only when the indictment is manifestly deficient or palpably defective." State v. Hogan, 144 N.J. at 229, 676 A.2d 533.
Despite the clarity of these principles, the triadic relationship between the grand jury, the prosecutor and the courts has been the source of much litigation and concern. See, e.g., State v. Hogan, 144 N.J. at 233-35, 676 A.2d 533; State v. Perry, 124 N.J. at 168, 590 A.2d 624; State v. Murphy, 110 N.J. at 30, 538 A.2d 1235; State v. Doliner, 96 N.J. 236, 249-52, 475 *1023 A.2d 552 (1984); State v. Vinegra, 73 N.J. 484, 497-505, 376 A.2d 150 (1977) (Hughes, C.J., dissenting); State v. Engel, 249 N.J.Super. 336, 359, 592 A.2d 572 (App. Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991); State v. Childs, 242 N.J.Super. 121, 129, 576 A.2d 42 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 596 (1990); State v. Vasky, 218 N.J.Super. 487, 490-91, 528 A.2d 61 (App.Div.1987); State v. Hilltop Private Nursing Home, Inc., 177 N.J.Super. 377, 388-89, 426 A.2d 1041 (App.Div.1981); State v. Schamberg, 146 N.J.Super. 559, 563, 370 A.2d 482 (App. Div.), certif. denied, 75 N.J. 10, 379 A.2d 241 (1977); State v. Hart, 139 N.J.Super. 565, 567-68, 354 A.2d 679 (App.Div.1976).
Most of the decisions we have cited pertain to claims of prosecutorial misconduct. In evaluating these claims, it has been said that unless the prosecutor's misconduct "is extreme and clearly infringes upon the [grand] jury decision-making function," an otherwise valid indictment should not be dismissed. State v. Schamberg, 146 N.J.Super. at 564, 370 A.2d 482. Stated somewhat differently by the United States Supreme Court, dismissal of an indictment is appropriate only "`if it is established that the violation substantially influenced the grand jury's decision to indict,'" or if there is "`grave doubt'" that the determination ultimately reached was arrived at fairly and impartially. Bank of Nova Scotia v. United States, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228, 238 (1988) (quoting United States v. Mechanik, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50, 61 (1986)).
The test for determining whether an indictment should be dismissed for prosecutorial misconduct may be variously phrased depending upon the specific error claimed. However phrased, we review the issues presented here with the aim of determining whether the grand jury's function was subverted, causing it to arrive at a result which it otherwise would not have reached.

V.
We first consider whether the deputy attorney general's instruction on the governing principles of law was fundamentally unfair. As a threshold matter, we must decide whether a prosecutor has a duty to instruct a grand jury with respect to defenses or justifications, and, if so, when such a duty arises.
We have found no reported New Jersey opinion dealing with the precise question of whether exculpatory defenses must be charged to a grand jury. In a somewhat related context, we have said that "a prosecutor's advice ... on the applicable law helps make the grand jury more effective." State v. Laws, 262 N.J.Super. 551, 562, 621 A.2d 526 (App.Div.), certif. denied, 134 N.J. 475, 634 A.2d 523 (1993). However, we have also observed that nothing in the New Jersey Constitution demands "a verbatim reading of applicable statutes or a recitation of all legal elements of each charge...." Ibid.; see also State v. Ball, 268 N.J.Super. 72, 120, 632 A.2d 1222 (App.Div.1993), aff'd, 141 N.J. 142, 661 A.2d 251 (1995), cert. denied sub nom. Mocco v.. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 731 (1996); State v. Schmidt, 213 N.J.Super. 576, 584, 517 A.2d 1226 (App.Div.1986), rev'd on other grounds, 110 N.J. 258, 540 A.2d 1256 (1988).
We nevertheless are not without guidance. In State v. Hogan, 144 N.J. 216, 676 A.2d 533, our Supreme Court considered the related question of whether it is incumbent upon a prosecutor to present exculpatory evidence to a grand jury. Departing from federal precedent, see United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the Court invoked its supervisory power and held that a grand jury "cannot be denied access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a prima facie case against the accused." Id. at 236, 676 A.2d 533. To qualify, the exculpatory evidence must *1024 squarely refute an element of the crime. Id. at 237, 676 A.2d 533. Moreover, the exculpatory value of the evidence must be analyzed "in the context of the nature and source of the evidence, and the strength of the State's case." Ibid. The Court emphasized that the prosecutor need not "construct a case for the accused or search for evidence that would exculpate the accused." Id. at 238, 676 A.2d 533.
The Court did not explicitly adopt a standard of review in determining whether a prosecutor's failure to present exculpatory evidence requires vitiation of an indictment. While noting that such a failure "may raise questions about the prosecuting attorney's good faith and could deprive the grand jury of the opportunity to screen out unwarranted prosecutions," the Court observed that ascertaining the exculpatory value of evidence at early stages in the proceedings can be a difficult task, and a reviewing judge "should act with substantial caution before concluding that a prosecutor's decision in that regard was erroneous." Id. at 238-39, 676 A.2d 533.
In our view, a prosecutor's obligation to instruct the grand jury on possible defenses is a corollary to his responsibility to present exculpatory evidence. The extent of the prosecutor's duty must be defined with reference to the role of the grand juryto protect the innocent, and bring to trial those who may be guilty. Viewed from this perspective, the question of whether a particular defense need be charged depends upon its potential for eliminating a needless or unfounded prosecution. The appropriate distinction for this purpose is between exculpatory and mitigating defenses. An exculpatory defense is one that would, if believed, result in a finding of no criminal liability, i.e., a complete exoneration.
This is the rule followed in New York. See People v. Valles, 62 N.Y.2d 36, 476 N.Y.S.2d 50, 464 N.E.2d 418 (1984). We are convinced that it has substantial utility. The rule accords with common sense and promotes the ability of a grand jury to filter out cases that should never be tried. We adopt that rule to the extent that it defines the existence of the prosecutor's duty.
We now focus upon the scope of the prosecutor's duty. The first question is when such a duty arises. The rule prevailing in New York is that where the evidence supports a defense of justification, it must be charged. People v. Cox, 92 N.Y.2d 1002, 1004, 684 N.Y.S.2d 473, 707 N.E.2d 428, 429 (1998); see also People v. Padgett, 60 N.Y.2d 142, 145, 468 N.Y.S.2d 854, 456 N.E.2d 795, 797 (1983). "In determining whether justification should be charged, the record must be viewed in the light most favorable to the defendant." People v. Torres, 252 A.D.2d 60, 65, 686 N.Y.S.2d 375, 378, appeal denied, 93 N.Y.2d 1028, 697 N.Y.S.2d 587, 719 N.E.2d 948 (1999). Phrased somewhat differently, under New York law, "where the evidence suggests that a complete defense such as justification may be present, the prosecutor must charge the grand jurors on that defense...." People v. Goetz, 68 N.Y.2d 96, 115, 506 N.Y.S.2d 18, 497 N.E.2d 41, 53 (1986).
With all due regard to our sister state, we are convinced that the New York rule poses too great a burden on the prosecutor. Whether the evidence reasonably supports a justification defense is often a difficult question depending on nuances and inferences that may not be apparent at the grand jury stage of the proceedings. See State v. Fair, 45 N.J. 77, 93, 211 A.2d 359 (1965) (failure to charge the jury with justification of defense of another plain error where facts adduced at trial suggested defendant could have believed another person was in danger); State v. Blanks, 313 N.J.Super. 55, 69, 712 A.2d 698 (App.Div.1998) (improper denial of self-defense charge where trial testimony showed defendant brandished weapon but denied causing injury); State v. Mount, 73 N.J.L. 582, 64 A. 124 (E. & A.1906) (trial court erred in not charging the jury with self-defense where defendant had reasonable *1025 apprehension of bodily injury); State v. Doss, 310 N.J.Super. 450, 459, 708 A.2d 1219 (App.Div.), certif. denied, 155 N.J. 589, 715 A.2d 992 (1998) (failure to charge on self-defense and defense of another not plain error where no evidence produced to support defendants' claims that force was necessary under the circumstances); State v. Jones, 214 N.J.Super. 68, 75, 518 A.2d 496 (App.Div.1986), certif. denied, 107 N.J. 102, 526 A.2d 176 (1987) (failure at trial to give instruction on self-defense not error given facts adduced at trial); State v. Rivers, 252 N.J.Super. 142, 149, 599 A.2d 558 (App.Div.1991) (charge on self-defense properly denied because facts at trial did not warrant such a charge); State v. Perry, 124 N.J. at 162, 590 A.2d 624 (lack of sua sponte charge on self-defense not plain error when facts could have supported such a charge, but charge was unrequested and would be incompatible with the defense strategy).
By its very nature, the grand jury does not consider a full and complete adversarial presentation, "and the instructions are not made after consideration [and with the benefit] of the views of the defense." State v. Schmidt, 213 N.J.Super. at 584, 517 A.2d 1226. We do not believe that the prosecutor has the obligation on his own meticulously to sift through the entire record of investigative files to see if some combination of facts and inferences might rationally sustain a defense or justification. Cf. State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985). The rule should be that it is only when the facts known to the prosecutor clearly indicate or clearly establish the appropriateness of an instruction that the duty of the prosecution arises. Ibid.; see also State v. Bell, 60 Haw. 241, 589 P.2d 517, 518 (1978), rev'd on other grounds, State v. Chong, 86 Hawai'i 282, 949 P.2d 122 (1997) (prosecution is not required to instruct the grand jury as to the nature and significance of evidence relating to self-defense unless the evidence clearly establishes that the accused acted in self-defense).
The second question concerning the scope of the prosecutor's duty pertains to the adequacy of the instruction given. It has been said that incomplete or imprecise instructions by a prosecutor will not ordinarily warrant dismissal of the indictment. State v. Ball, 268 N.J.Super. at 120, 632 A.2d 1222; State v. Schmidt, 213 N.J.Super. at 584, 517 A.2d 1226. It is unrealistic to call upon a prosecutor to provide the grand jury with a sophisticated analysis of the law where he does not have the benefit of the views of the defense to warn him of potential problems and pitfalls. There is a difference between instructions that are merely imprecise or incomplete and those that are blatantly wrong. As long as the instruction conveys to the grand jury the gist of the exonerating defense or justification, the prosecutor's duty is met.
The final issue to be considered is the standard of judicial review. We should not review the prosecutor's decisions from the vantage point of twenty-twenty hindsight. We must instead recognize that prosecutors must often make these decisions without the benefit of quiet contemplation. Because an indictment should be dismissed only on the clearest and plainest grounds, the test should be a rigorous one. Only in the exceptional case will a prosecutor's decision pertaining to an instruction on justification constitute grounds for challenging an indictment. The standard can be articulated in a variety of ways, but we suggest that an indictment should not be dismissed unless the prosecutor's error was clearly capable of producing an unjust result. This standard can be satisfied by showing that the grand jury would have reached a different result but for the prosecutor's error. Against this backdrop, we find no error warranting dismissal of the indictment.

A.
As we noted earlier, the deputy attorney general instructed the grand jury on the justifications of self-defense and *1026 defense of others. Judge Smithson found that these instructions were defective because the prosecutor did not charge the grand jury on the law enforcement exception to the duty to retreat set forth in N.J.S.A. 2C:3-4(b)(2)(b)(ii). The operative language of that subsection reads in pertinent part as follows:
(2) The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm; nor is it justifiable if:
....
(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:
....
(ii) A public officer justified in using force in the performance of his duties or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape is not obliged to desist from efforts to perform such duty, effect such arrest or prevent such escape because of resistance or threatened resistance by or on behalf of the person against whom such action is directed.

[N.J.S.A. 2C:3-4(b)(2)(b)(ii).]
The statute is not a model of clarity. We nevertheless see no need to analyze or construe the statutory language. The simple and overriding fact is that the duty to retreat was not an issue in this case. Although the deputy attorney general alluded to the subject in his preliminary instructions to the grand jury on January 5, 1999, he did not repeat this reference in his final charge on September 7, 1999. In his preliminary instructions, the deputy attorney general emphasized that his description of the law was cursory and intended only to provide the grand jury with an overview before receiving the evidence. The deputy attorney general also stressed that he would provide the grand jury with a more complete charge at the conclusion of the case prior to its deliberations. We are satisfied that the deputy attorney general's initial, erroneous reference to the duty to retreat was harmless in light of his later charge to the grand jury which was entirely silent on the subject. Since the deputy attorney general did not ultimately charge the grand jury on the subject of retreat, no error was committed in his failure to instruct on the exception to that doctrine.
We add for the sake of completeness that we have examined the deputy attorney general's instructions on the justifications of self-defense and defense of others, and we are satisfied that the applicable legal principles were adequately conveyed to the grand jury. Defendants argue that the deputy attorney general erroneously charged the grand jury on a mistake of law under N.J.S.A. 2C:3-9. They also claim that the deputy attorney general erred in charging the grand jury that self-defense and defense of others were not applicable to crimes involving "reckless" conduct. Judge Smithson did not rule on these issues.
While we are inclined to agree that mistake of law under N.J.S.A. 2C:3-9 was not an issue in the case, and that the deputy attorney general erred by alluding to it in his preliminary instructions on January 5, 1999, this error was not repeated in his final charge to the grand jury on September 7, 1999. The initial erroneous instruction could not reasonably have misled the grand jury. Nor did it have the capacity to produce an unjust result.
We find no error in the deputy attorney general's statement that the Code's justification defenses are not available in a prosecution where recklessness or negligence suffices to establish the requisite culpability state. The deputy attorney general was obviously referring to the *1027 Supreme Court's decision in State v. Moore, 158 N.J. 292, 729 A.2d 1021 (1999). There, the Court held that "[t]he drafters of the Code did not intend that a defendant who recklessly causes serious bodily injury under circumstances manifesting extreme indifference to the value of human life" should be able to find shelter in the justification defenses. Id. at 303, 729 A.2d 1021. The Court said that "[w]here recklessness or negligence is the requisite mental state to establish an offense, ... self-defense is not a justification." Id. at 301, 729 A.2d 1021.
The deputy attorney general's instruction was a correct statement of the law when viewed in the context of the entire charge. Stripped to its essentials, the charge conveyed the principle that if defendants were reasonable in perceiving they were under attack and used reasonable force to repel that attack, they could not be charged with aggravated assault, an offense that required "reckless" conduct as an alternative predicate to a conviction. We perceive no error, much less an error sufficient to require dismissal of the indictment.

B.
Judge Smithson found that the deputy attorney general erred in failing to charge the grand jury with respect to the use of force in law enforcement under N.J.S.A. 2C:3-7. That statute provides that the use of force is justifiable when the actor "reasonably believes that such force is immediately necessary to effect a lawful arrest." N.J.S.A. 2C:3-7(a). However, the use of deadly force is not justifiable under N.J.S.A. 2C:3-7(b)(2) unless:
(a) The actor effecting the arrest is authorized to act as a peace officer or has been summoned by and is assisting a person whom he reasonably believes to be authorized to act as a peace officer; and
(b) The actor reasonably believes that the force employed creates no substantial risk of injury to innocent persons; and
(c) The actor reasonably believes that the crime for which the arrest is made was homicide, kidnapping, an offense under 2C:14-2 or 2C:14-3, arson, robbery, burglary of a dwelling, or an attempt to commit one of these crimes; and
(d) The actor reasonably believes:
(i) There is an imminent threat of deadly force to himself or a third party; or
(ii) The use of deadly force is necessary to thwart the commission of a crime as set forth in subparagraph (c) of this paragraph; or
(iii) The use of deadly force is necessary to prevent an escape.
[N.J.S.A. 2C:3-7(b)(2).] Further, N.J.S.A. 2C:3-7(e) permits the use of force to prevent the commission of certain criminal acts. That section reads in pertinent part as follows:
The use of force upon or toward the person of another is justifiable when the actor reasonably believes that such force is immediately necessary to prevent such other person from committing suicide, inflicting serious bodily harm upon himself, committing or consummating the commission of a crime involving or threatening bodily harm, damage to or loss of property or a breach of the peace, except that:
(1) Any limitations imposed by the other provisions of this chapter on the justifiable use of force in self-protection, for the protection of others, the protection of property, the effectuation of an arrest or the prevention of an escape from custody shall apply notwithstanding the criminality of the conduct against which such force is used; and
(2) The use of deadly force is not in any event justifiable under this subsection unless the actor reasonably believes that it is likely that the person whom he seeks to prevent from committing a crime will endanger human life or inflict *1028 serious bodily harm upon another unless the commission or the consummation of the crime is prevented and that the use of such force presents no substantial risk of injury to innocent persons.

[N.J.S.A. 2C:3-7(e).]
We agree with the State's argument that the deputy attorney general did not violate his duty by failing to apprise the grand jury of these statutes. Defendants contended below, and continue to assert here, that they were entitled to employ deadly force in order to effectuate an arrest for attempted murder and to prevent the occupants of the van from escaping. However, defendants did not claim in their statements that they fired their weapons for this purpose. While perhaps one might reasonably conclude that Moore and Reyes were attempting to commit murder by backing the van in the direction of Hogan, neither defendant articulated this thesis. Rather, they contended that they felt themselves imperiled, and that they employed deadly force for self-protection. Beyond this, N.J.S.A. 2C:3-7(b)(2)(b) makes this defense unavailable unless "[t]he actor reasonably believes that the force employed creates no substantial risk of injury to innocent persons." It is certainly arguable that the rear seat passengers, who had no control over the van, were entirely innocent of any plot to commit attempted murder, and that defendants' use of deadly force needlessly endangered them and put them at risk. We do not suggest that upon submission of an appropriate request to charge, it would be improper for a trial judge to instruct a petit jury on this defense. However, it cannot fairly be said that this justification was clearly indicated or clearly established by the evidence.
We also agree with the State's argument that it was not incumbent on the deputy attorney general to instruct the grand jury with respect to N.J.S.A. 2C:3-7(e). "Subsection e appears to be a separate justification for force used to prevent crime, but that appearance is largely illusory." Cannel, Criminal Code Annotated, Comment N.J.S.A. 2C:3-7 at 192 (2000-2001). "The subsection merely incorporates other relevant sections, ... and its deadly force provision is a restatement of [N.J.S.A.] 2C:3-4 and [N.J.S.A.] 2C:3-5 with the additional limitation that there be no substantial risk to innocent persons." Ibid. Defendants can find no comfort in N.J.S.A. 2C:3-7(e), at least at this stage of the proceedings.

VI.
Judge Smithson found that the return of the intervening indictment violated defendants' rights. The judge observed that Hogan and Kenna "were cast as the poster boys for racial profiling following the release of the indictment." The judge construed the chronology of events, and depicted the attorney general's attempt to justify it, as "mean[ing] there existed powerful and intimidating forces driving the decision-making of the Office of the Attorney General." The judge suggested that the "motivation to allow the return of the [intervening] indictment[ ] was considerably more a matter of political expediency than of concern for the substantive right of [the] defendants."
The judge's comments were unfounded and unfair. We, of course, recognize that the separation of powers doctrine does not compel the three branches of government to operate as hermetically sealed, watertight compartments. We acknowledge that the conduct of one branch will sometimes affect another. We are nevertheless aware of no constitutional or jurisprudential doctrine that grants the judiciary a roving commission to oversee the conduct of the Attorney General's investigations of possible criminal acts. Although not an elected official, the Attorney General, as chief law enforcement officer of the State and as a member of the Executive Branch, is ultimately answerable to the people. That is not to suggest that the Attorney General may denigrate or act in *1029 derogation of individual rights to satisfy public opinion or for political considerations. But the Attorney General owes the duty to respond to the legitimate concerns of the citizenry. The judiciary has no power to ordain that the Attorney General be insensitive to such public concerns.
The sad but true fact is that a substantial segment of the public doubts the ability and willingness of the law enforcement community to enforce the criminal laws in a fair and evenhanded manner. We broached the subject a decade ago in State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834 (App.Div.1991). This is neither the time nor place to discuss the merits of the issue. Instead, the point to be stressed is that we cannot fault the Attorney General's Office for mounting a timely investigation and obtaining an indictment when faced with evidence that defendants might have violated the law. There is no evidence in the record to support the judge's charge that release of the intervening indictment was calculated to deny, or had the effect of denying, the defendants' rights.
The Attorney General did not act in a vacuum. In 1986, we rendered our opinion in State v. Murphy, 213 N.J.Super. 404, 517 A.2d 501 (App.Div.1986). We held that where a prosecutor obtains information which supports a legitimate and colorable basis for believing that a grand juror lacks impartiality, he must inform the assignment judge so that the issue can be fully explored and fairly resolved. Id. at 409, 517 A.2d 501. Two years later, the Supreme Court affirmed that holding. 110 N.J. 20, 538 A.2d 1235 (1988). Thus, for over twelve years procedures have been in place to resolve the question whether a sitting grand juror's ability to be fair has been infected by some extraneous information or event. Those procedures were meticulously followed in this case. Elaborate steps were taken by the Attorney General's Office and the Assignment Judge to question the grand jurors and determine if their ability to be fair was compromised by the intervening indictment. As we noted earlier, two grand jurors were excused, but the Assignment Judge found that the panel was otherwise untainted. The Assignment Judge's findings are unassailable and are supported by substantial credible evidence.
The Attorney General's Office took other steps to insure fairness. The decision to conduct two separate grand jury proceedings was designed to prevent the grand jury investigating the shootings from considering charges that were not germane to the factual issues presented. While there was no legal requirement that the State conduct separate grand jury proceedings, see State v. Riley, 97 N.J.Super. 542, 548, 235 A.2d 503 (Law Div.1967), aff'd o.b., 101 N.J.Super. 402, 244 A.2d 513 (App.Div.1968), aff'd o.b., 53 N.J. 576, 252 A.2d 153 (1969), cert. denied, 397 U.S. 1011, 90 S.Ct. 1240, 25 L.Ed.2d 424 (1970), bifurcation was intended to insulate each panel to the extent possible.
We add that the Attorney General's other options were distinctly unpalatable. The Attorney General could have delayed the false reports investigation until completion of the grand jury's inquiry concerning the shooting incident. But this course would have been highly impractical and self-defeating. The Attorney General could have requested that the intervening indictment be sealed. But had the defendants been kept ignorant of the intervening indictment and had they testified before the grand jury considering the shooting incident, they could legitimately claim that they were ambushed by the Attorney General's concealment of the racial profiling charges. Had they later accepted the Attorney General's invitation to appear not knowing of the intervening indictment, they could argue that the grand jury investigating the shooting incident was improperly used to garner evidence to support the racial profiling charges. We are satisfied after a thorough review of the record that the intervening indictment in no way impacted the *1030 defendants' decision not to appear before the grand jury regarding the shooting incident.
We thus find nothing fundamentally unfair or improper in the timing of the indictments.

VII.
The Law Division judge faulted the Attorney General's Office for improperly converting the grand jury from an "accusative" to an "adjudicative" body. This characterization of the grand jury proceedings was apparently based on the substantial amount of evidence presented to the grand jury, the deputy attorney general's extensive summary of the proofs presented, and the deputy attorney general's exhortation to the grand jury to resolve issues of credibility and determine the truth.
In support of his assertion of prosecutorial misconduct, the judge quoted liberally from Supreme Court decisions pertaining to the role and function of the grand jury. For example, the United States Supreme Court has accurately characterized the grand jury as an accusatory and not an adjudicative body. United States v. Williams, 504 U.S. at 51, 112 S.Ct. at 1744, 118 L.Ed.2d at 368. The Court has also observed that the grand jury's role is not to weigh evidence presented by each party, but rather to investigate and decide whether criminal acts have occurred and whether criminal proceedings should be commenced. United States v. Calandra, 414 U.S. 338, 343-44, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569 (1974). In a similar vein, our Supreme Court has noted that credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury. State v. Hogan, 144 N.J. at 235, 676 A.2d 533. The Court has also said that the prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime.
These statements are truisms. They describe the limited nature of the prosecutor's obligation to present evidence to a grand jury. The cases upon which the judge relied were not meant to place limits on the amount of evidence a grand jury may receive. Taking these statements out of context, the judge incorrectly converted the prosecutor's minimum obligation into an ironclad, legal duty not to present evidence.
The judge also misconceived the power of the grand jury to receive evidence. It is true that federal and state decisions do not impose an obligation on the grand jury to weigh the evidence or resolve credibility questions. However, the judge inverted the meaning of these decisions by placing arbitrary limits on the grand jury's power and role. The courts have never viewed the investigative and accusatory function of the grand jury as a limitation on its power to receive and consider evidence. Such a limitation is foreign to the scene. The grand jury's power to investigate would be feeble indeed if it lacked the authority to assess the credibility of witnesses and weigh the evidence in determining whether criminal charges should be brought. We know of no constitutional principle that requires a grand jury to accept on faith the assertions of the witnesses who have appeared.
Finally, we disagree with the judge's characterization of the deputy attorney general's synopsis of the evidence as a prosecutorial "summation." Throughout his presentation, from the commencement of the proceedings to their conclusion, the deputy attorney general cautioned the grand jury that his statements did not constitute evidence. The grand jury was repeatedly admonished that it had the ultimate responsibility to determine what the evidence meant and whether it was sufficient to return an indictment. We have carefully reviewed the deputy attorney general's final statement to the grand jury. We find no basis for concluding that the deputy attorney general's summary of the evidence had the *1031 capacity to mislead the grand jury or improperly influence its determination.
Reversed.